**PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,**

v.

**The AETNA CASUALTY AND SURETY COMPANY et al., Defendants.**

No. 71 Civ. 1118.

United States District Court,
S. D. New York.

Sept. 17, 1973.

---

**1100**

Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiff; Fowler Hamilton, James C. Blair, Luther Nadler, Roger E. Berg, New York City, of counsel.

Davis Polk & Wardwell, New York City, for the Aetna Casualty and Surety Company, and others, denominated first, second and third claim defendants; Lawrence E. Walsh, Henry L. King, Guy Miller Struve, Bartlett H. McGuire, Charles J. Moxley, Jr., Jack P. Levin, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, Co-counsel for second claim defendants; John J. Martin, New York City, of counsel.

Paul J. Curran, U. S. Atty., S. D. N. Y., for the United Statès; Daniel H. Murphy II, Mel P. Barkan, Asst. U. S. Attys., of counsel.

Mendes & Mount, New York City, for defendants, Philip Gaybell Wright ·and others, denominated as fifth claim defendants; Matthew Corrigan, Stephen E. Cohen, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, Co-counsel for fifth claim defendants; William E. Hegarty, Floyd Abrams, Roger S. Fine, Michael P. Tierney, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

On September 6, 1970, the plaintiff, an international air carrier, was operating a Boeing 747 ("jumbo jet") airplane on its scheduled Flight No. 093 from Brussels, Belgium, to New York City, with a stop in Amsterdam, Holland. As the airplane proceeded from Amsterdam toward London, two of its passengers produced hand guns and grenades, took forcible command of the crew and the passengers, and ordered the pilot to pro-

ceed to Beirut, Lebanon. The hijackers, though not themselves Arabs, were working with and for the Palestinian organization called the Popular Front for the Liberation of Palestine (PFLP). In collaboration with other PFLP people who met them in Beirut, they laced the aircraft with explosives during and after a stop in the Lebanese capital. Then they caused the airplane to be flown to Cairo, Egypt, lighting fuses just before landing to ignite the explosives. The large complement of passengers and crew were thus given scant minutes to disembark as the plane landed at Cairo and flee (at a cost in terror and some substantial injuries) before the craft exploded, burned, and was totally destroyed.

The plaintiff carried a more or less seamless mosiac of "all risk" and "war risk" insurance policies written (at varying times) by an array of private insurers and the United States Government. Pieced together the policies covered all, or, at worst for plaintiff, nearly all, of the loss. The central problem, too simply put, is which piece or pieces of coverage apply—or, with slightly greater accuracy but still over-simply, whether the loss is among those excluded from "all risks" and included among "war risks." All of the insurers have disclaimed liability. The plaintiff has sued them all, invoking our undisputed diversity jurisdiction as against the private carriers and 49 U.S.C. § 1540 against the Government.[1]

We have been led by the nature of the insurance questions to touch in the trial upon large topics of history, politics, and human sorrow in the Middle East. The roster of witnesses has been impressive and cosmopolitan, including, for example, a former Judge and Minister of the Government of Jordan, a commanding general of the Palestine Liberation Army, articulate Middle East correspondents, Israeli intelligence and secu-

rity officers, hijacked pilots, crew, and passengers, and a guerilla warrior-scholar, along with insurance underwriters, ticket agents, and other people at least equally important for us, if possibly less glamorous. We have learned probably a good deal more than was necessary for this insurance case about the origins and course of contemporary Arab-Israeli struggles. At the same time, we have learned at most a minuscule fraction of what would need to be known before beginning to make broad, objective, and responsible judgments worthy of note beyond the confines of this lawsuit. So it bears early emphasis and recognition throughout that the findings now to be announced have significance only as they affect plaintiff's insurance claims. They are not meant to be—the court is neither competent nor authorized to make—official or unofficial judgments concerning foreign policy, the virtues or vices of governments, movements, and individuals embattled in the Middle East, or the "justice" or wisdom of claims for which so many have been suffering and fighting and dying.

These preliminary observations would be superfluous if it were not for some incidental facts in and around the litigation. For one thing, all involved have been made aware that people called as witnesses, as well as others allied in political interest with them, have seen fit to hope or believe that their causes might be advanced or obstructed by an American court's reasons for saying one group of insurers rather than another must pay for the destroyed airplane. In the charged circumstances this belief is understandable. But it is, or should be, entirely mistaken. In a more arguable and legally apposite vein, but also erroneously in the court's view, one group of defendants has pressed upon us that our subject is governed by a "consistent policy" of the American State Department and that treatment of the loss as falling

---

1. Strictly speaking, six all risk insurers are not named because they are, like plaintiff, New York corporations which would by their presence defeat diversity. All seem agreed that their absence creates no problem for anybody, and the court accepts and relies upon that responsible indifference.

within certain of the war risks "cannot help but be construed as granting some measure of legitimacy to * * * acts of terrorism in direct contravention of the foreign policy of the United States." The court perceives no such constraint and no such danger. The "United States" is here only coincidentally, as an insurer. The State Department, also coincidentally in this aspect, has been here as a source of documents and information. We have had no official intimation of how this case might be affected by American foreign-policy concerns and, even more clearly, no suggestion that what we say or do could imaginably graze the course of the nation's foreign affairs.

It is stressed again, therefore, that nothing said herein is intended or suited (or should be read) to affect in the slightest the momentous subjects of foreign policy and international judgment that are outside our province. Today's opinion decides nothing of right and wrong among Palestinians, Syrians, Israelis, Egyptians, Iraquis, Saudi Arabians, Lebanese, Libyans, or, indeed, Americans and Russians, as they have been encountering each other in the events of the Middle East.

The court has made only the relatively minute determination that the all risk insurers are liable for plaintiff's entire loss. We now proceed to state the findings and conclusions deemed to require that result.

## I. FACTS

*The insurers and insurance policies*

The defendants are three groups of insurers:

(1) The all risk insurers, named in the first three claims of the amended complaint, issued identical policies affording coverage in the year beginning November 12, 1969, for the full agreed value of the aircraft, $24,288,759. Defendants named in the first claim are American companies which covered one third of the total. The second claim defendants are Lloyds underwriters, plus other British and foreign companies, collectively covering one sixth of the insured value. The defendant in the third claim covered one half.

As its familiar shorthand label conveys, the all risk insurance covered "all physical loss of or damage to the aircraft," except as limited by specified exclusions. The major subject of this lawsuit has been whether any of these exclusions defeats recovery from the all risk defendants. The pertinent exclusions are these:

"1. capture, seizure, arrest, restraint or detention or the consequences thereof or of any attempt thereat, or any taking of the property insured or damage to or destruction thereof by any Government or governmental authority or agent (whether secret or otherwise) or by any military, naval or usurped power, whether any of the foregoing be done by way of requisition or otherwise and whether in time of peace or war and whether lawful or unlawful (this subdivision 1. shall not apply, however, to any such action by a foreign government or foreign governmental authority following the forceful diversion to a foreign country by any person not in lawful possession or custody of such insured aircraft and who is not an agent or representative, secret or otherwise, of any foreign government or governmental authority);

"2. war, invasion, civil war, revolution, rebellion, insurrection or warlike operations, whether there be a declaration of war or not;

"3. strikes, riots, civil commotion."

In July 1970 the all risk coverage afforded by the first and third claim defendants was increased at plaintiff's request. The exclusions in paragraph 3 ("strikes, riots, civil commotion") were deleted by these American insurers, but only up to a limit of $10,062,393 in excess of $14,226,290 on each 747 aircraft.

Within this limit the first and third claim defendants each assumed 50% of the additional coverage. This would mean, if the third exclusion were found applicable, that the first and third claim defendants would be liable for $10,062,-393, and the fifth claim (war risk) defendants for $14,226,290.

For all risk coverage of its 747 fleet, plaintiff paid premiums totaling $4,571,635 for the period January 1, 1970, to September 21, 1970.[2] The added coverage of strikes, riots, and civil commotion, was given by the first and third claim defendants from July 27, 1970, to November 12, 1970, for a premium of $29,935.

(2) The defendant in the fourth claim is the United States, which, under the aegis of the Federal Aviation Administration pursuant to the Federal Aviation Act, 49 U.S.C. §§ 1531–42, supplied insurance coverage for specified risks to the extent of $9,763,709 in excess of $14,226,290.[3] The government policy covered loss or damage "resulting from the risks" enumerated as follows:

"War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution or insurrection, military or usurped power or confiscation and/or nationalization or requisition or destruction by any government or public or local authority or by any independent unit or individual engaged in irregular warfare."

This policy also provided:

"Notwithstanding anything contained in the coverage clauses * * *, this insurance does not cover any loss or damage or any legal liability arising out of or caused by or resulting from capture, seizure, arrest, restraint, detainment, preemption, confiscation or requisition by the Government of the United States, or of the country in which the aircraft is owned, or registered, or from arrests, restraints or detainments under Customs regulations or quarantine regulations or similar arrests, restraints or detainments, or any other loss, damage, or legal liability not arising from actual or impending hostilities or sanctions."

In addition, the government coverage excluded

"[a]ny liability or claim for injury, loss, damage or expense covered under any other policy of insurance, including any guaranty or indemnity agreement, in effect for the benefit of the Insured; the Insured warrants that the Insurer shall be free from any such liability or claim."

The premium paid by plaintiff to the Government was $45,000 for the period January 1, 1970, to September 21, 1970.

(3) The remaining defendants, named in the fifth claim, are Lloyds underwriters and other insurers doing business in the London insurance market, all of whom will be referred to collectively as the war risk insurers.[4] These defendants issued policies effective for a year from January 1, 1970—i. e., almost two months after inception of the all risk policies. Although at the time of inception and before formal issuance of the commercial war risk policy the war risk coverage differed slightly from the all risk exclusions, by the time of the loss in question the war risk coverage was, in identical words, the three paragraphs of all risk exclusions quoted above, but

2. The comparison of premiums paid by plaintiff to the various insurers is for the period beginning January 1, 1970, the inception date of the private war risk insurance, despite the fact that the all risk policy and the government policy covered, respectively, periods beginning earlier and later than that. The premium figures, of some interest because of their comparative size, are mainly those the parties were able to assemble and agree upon for the identical period.

3. The discrepancies in total coverages under the several policies stem for differences in the agreed value of the 747 airplane. This is not the subject of any controversy among the parties.

4. Strictly speaking, the government policy is a form of "war risk" coverage. The usage now adopted is convenient, however, and should cause no confusion.

its upper limit was $14,226,290. It was possible, therefore, that a total loss might be excluded from all risk coverage and covered (ignoring insubstantial discrepancies in agreed values) partly by the Government and partly by the war risk insurers—e. g., if the loss were found to result from "war, invasion, civil war, revolution, rebellion," or other causes covered by the two latter categories of defendants. It is the primary contention of the all risk insurers that this is the result required on the facts of this case.

The war risk insurers received from plaintiff a premium of $190,511 for the period January 1, 1970, to September 21, 1970.

*Background: Palestine, Israel, and the Palestinians*

Among the conflicts in this litigation have been disputes about whether or how we should canvass the history of struggle centering upon what is now Israel, the present and former population of what was Palestine, and the surrounding Arab States. Broadly stated, the positions have ranged from urging the subject to be almost wholly immaterial to contending that we must turn every stone and expose the files of the Central Intelligence Agency to pinpoint the allignments, relationships, strategies, tactics, and secret information about all these, that would assertedly reveal the true causes of, and hence what insurance should now cover, the loss of plaintiff's

airplane. Woven through the debate has been an insistent strand of argument, notably by the war risk insurers, that our compelling allegiances are to Wigmore more than to Clio, that we must be vigilant against casual expansions of the exceptions to the hearsay rule. The court has steered through this well modulated storm a course of imperfect rigor. We have heard much hearsay, some allowed only on extremely latitudinarian versions of orthodox principles. Leaving aside for the moment questions of materiality and relevance, we have judged that such things as the membership of foreign paramilitary or terrorist groups, and the facts of even small battles or guerilla attacks, though recent rather than ancient,[5] cannot be reported at all in our courtrooms unless the standard rules of evidence are relaxed. We have made pragmatic judgments in ruling from time to time that dubious or suspect evidence should be taken from all sides, however skeptically, when the practical alternative was to have no evidence of any kind.

If there have been, as there surely have been, some technical solecisms along the way, there appears in the end to have been little or no damage to substantial interests. To a preponderant extent, the historical facts now found to be material are not seriously disputed, whether or not most of them might approach or be matters for judicial notice. The important and difficult questions

---

5. It is generally recognized that reputation is acceptable as proof of historical events of general interest in the community, despite the fact that such evidence is hearsay. 5 Wigmore, Evidence §§ 1597–99 (3d ed. 1940); McCormick, Evidence, § 324 (2d ed. 1972); Prop.Fed.R.Evid. 803(20). Wigmore suggests that the subject must be ancient in order for this exception to apply. The Proposed Federal Rules of Evidence, 803(20), however, would eliminate the requirement of antiquity since "[t]he historical character of the subject matter dispenses with any need that the reputation antedate the controversy with respect to which it is offered." Notes of Advisory Committee to Rule 803(20).

McCormick, on the other hand, finds in the term "history" a suggestion that "some re-

quirement of age is no doubt imposed." McCormick, *supra*, at 750.

There is also support for the use of experts to describe the platforms and objectives of the various fedayeen groups. In far more debatable cases, where the group or its members were themselves parties, courts have searched for objectives both in the group's own statements and in external (characteristically hostile) testimony sometimes contradicting or deviating from the public pronouncements. See, e. g., United States v. Dennis, 183 F.2d 201, 229 (2d Cir. 1950), aff'd, Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); United States v. Lightfoot, 228 F.2d 861, 867 (7th Cir. 1956), reversed on other grounds, 355 U.S. 2, 78 S.Ct. 10, 2 L.Ed.2d 19 (1957).

are not about what happened, but about how to characterize the key events for insurance purposes.

Thus, though it has been duly covered in courtroom testimony and depositions, all of us might have relied upon the library for the essential outlines of the history of modern Israel and the continued strife attending its existence. A United Nations resolution of November 29, 1947, declared that Palestine should emerge from the British mandate as two states—one Jewish, the other Arab—with an area around Jerusalem remaining under U.N. control. The leaders of Palestine's Arab population, supported by the neighboring Arab states, denounced the resolution. Large-scale fighting erupted between Arabs and Jews in Palestine, but by May 1948 the Jews had largely won the contest of force within Palestine. The State of Israel was proclaimed on May 14, 1948, and immediately recognized by the United States. On May 15, Arab armies from Egypt, Syria, Trans-Jordan, Iraq and Lebanon invaded. After months of heavy fighting, with the Israelis on the whole victorious, there came a series of cease-fires and a 1949 armistice agreement under which Israel acquired 70% of the former mandate rather than the 50% for which the U.N. resolution had provided. Jordan, as it came to be known, took a strip on the west bank of the Jordan River and embraced its residents as citizens. Egypt occupied, but did not annex, the Gaza Strip adjoining Israel at the southeast corner of the Mediterranean. No Arab country has since made a peace treaty with, or recognized, Israel.

The upheavals of 1948–1949 led to an exodus of some 750,000 Arabs from the territory occupied by Israel. 400,000 went to Jordan, including the west bank area, 100,000 to Lebanon, 80,000 to Syria, and the rest to the Gaza Strip. Huge numbers were housed in refugee camps, where many live, with their descendants, to this day, often in grim conditions despite U.N. and some other assistance. The refugees in the Gaza Strip were barred from entry into Egypt. The other Arab states, except for Jordan, placed employment and other restrictions upon their refugee immigrants. Perhaps more potent than these restrictions in preventing their absorption or assimilation elsewhere was the determined view among many Palestinian Arabs that the partition must continue to be fought and that the State of Israel must be destroyed. Compromises urged by third parties have been rejected by both Arabs and Israelis. Among these was a U.N. proposal in 1948 that the refugees be given the choice of returning to their homes or settling elsewhere with compensation for property left behind. This idea has been regularly reaffirmed in the U.N. but regularly ignored by the contestants. An Israeli offer in 1949 to take back 100,000 of the émigrés was spurned by the Arab states as spokesmen for the Palestinians.

In the years since 1948 there have been two major outbreaks of fighting. In 1956 Israel, Great Britain, and France attacked Egypt. Under heavy pressure from the U.N., with the United States and the U.S.S.R. in significant accord, the fighting was ended and the invasions of Egypt, including deep Israeli penetrations of the Sinai, were reversed. A small U.N. Emergency Force was stationed in the Gaza Strip, to be withdrawn eleven years later in obedience to an Egyptian demand. In June 1967—after that demand, after Egypt had declared the closing of the Straits of Tiran, and after other demonstrations of hostile intent—a short but fierce war erupted. In six days of fighting Israeli forces occupied the Gaza Strip, the West Bank, the Sinai Peninsula, and the Golan Heights of Syria. The ranks of refugees were swollen by another exodus, mainly from the West Bank area. The number of additional refugees is given in the briefs, as in the underlying testimony, as something between 200,000 and 500,000. If the exact number mattered we would be in serious trouble. But it makes no special difference here, however much it signifies elsewhere. Simi-

larly, we need not determine the exact number still in refugee camps, said to be about 600,000, or the total properly to be considered refugees, given as being up to about 1,425,000. It is clear that the number—men, women, and children extending by now to two and three generations—is appallingly large. It is also clear that the number of those actually seeking to carry on the violent struggle, in Israel or elsewhere, is, as might be expected, a minute proportion of that total.

### Arab States, The Palestine Liberation Organization, and the Fedayeen

To a considerable degree, the continued conflict of the Palestinian Arabs against Israel—in the U.N., in diplomacy, in propaganda, and on the battlefield —has been carried on by the Arab states as such. The degree and nature of engagement by these states has varied among them at any given time and from time to time. Struggles for power within the Arab world and within Arab nations have affected the nature of their commitments to the Palestinian cause. Dealings with refugee groups and their leaders have been variously affected by the positions of the Arab governments relating to issues like cease-fires, the possibility of negotiating with Israel, and relations with such third powers as the United States, the U.S.S.R., Great Britain, and others.

As for the Palestinians themselves, organized leadership from within their ranks remained weak and insignificant until at least 1964. In that year representatives of various Palestinian groups met in Jerusalem and formed the Palestine Liberation Organization (PLO), which received recognition as an entity from the member states of the Arab League and was accepted as a non-voting member of the League. The PLO charter provided for a National Council, an Executive Committee, and an army, the Palestine Liberation Army (PLA). PLA units were deployed in various Arab countries, and its troops, estimated to number 12,000 to 15,000, fought against the Israelis in the Gaza Strip during the six-day war of 1967.

Beginning in 1949 a number of semi-secret Palestinian groups were organized, mostly by young men, all dedicated in their ways to Arab reconquest of Palestine. From these evolved the bulk of the 10 or more organizations that came to be known collectively as the "fedayeen." [6] Among the earliest of those that survived was Al Fatah, led by Yasser Arafat, which became the largest and most powerful of the groups. Arafat and the Fatah leadership came to believe that the Palestinians could not count on the unwavering support of Arab governments, but needed to develop forces capable on their own of conducting guerilla welfare. Beginning early in 1965, and up to the 1967 war, Al Fatah claimed 95 to 100 "operations" in Israel in the form of small incursions, aimed at sabotage (mining roads, attempts to blow up water pipes, etc.,) or such things as the occasional throwing of hand grenades at military vehicles and other attacks upon military targets. These operations from time to time evoked Israeli attacks in reprisal against targets in Jordan, Syria, and Lebanon.

Fatah membership embraced a considerable ideological spectrum, with unanimity only upon the goal of obliterating Israel as a state. United in this, Fatah undertook to minimize other ideological matters and to profess (and attempt largely to follow) a policy of noninterference in the internal affairs of Arab States.

Apart from Al Fatah, there has been a considerable number of shifting, splitting, combining, and resplintering fedayeen groups, with considerable competition among them for positions of leadership and ideological dominance. The PFLP, of primary interest in this case, was formed in October or November of 1967 from a coalition of four organiza-

---

6. An important PLO official, former commander of the PLA, defined "fedayeen" as individuals committed to political objectives to the point of preparedness to die for them.

tions dating back as far as the early 1950's. Said to have been second in size to Al Fatah, the PFLP vied for this rank with a group called Sa'iqa. Whichever in fact merited this standing, neither was more than a very distant second. While figures are widely variable and scarcely reliable from the record of this case, it is a best estimate that Al Fatah numbered some 4,000–5,000 in the times that concern us while the PFLP and Sa'iqa had about 600 to 1200 each. The PFLP total was comprised of 150 or so as the "permanent" core with a shifting, rapidly changing enrollment for the rest.

The PFLP was in important respects unique among the fedayeen groups. Interestingly, if not most importantly, its membership contained a large proportion of Christians, and its chief leader, Dr. George Habash, was a Christian. The central quality of the PFLP was its militant, Marxist-Leninist-Maoist ideology. Concentrating upon its revolutionary doctrines as the main concerns, it tended to view traditional Arab goals as somewhat secondary, if by no means inconsequential. Unlike Fatah's insistence upon "national liberation" as the essence of the conflict, the PFLP viewed the battle against Israel as part of a far broader revolution to be carried on in the Arab world. Indeed, as reflected in its slogan, "the road to Tel Aviv lies through Amman and Beirut," the PFLP believed that as a prerequisite to the confrontation with Israel, "reactionary" Arab regimes must first be overthrown. And this in turn was only part of the "main" or "real enemy," which "happens to be world imperialism, colonialism, universal capitalism, and world monopolies." [7] Pursuing such beliefs and objectives, the PFLP tended to follow a unique and independent course of its own, often professing unity, but often avowing overt conflict with the policies and views of other fedayeen organizations. Among the "reactionary" re-

gimes it numbered as enemies were most of the Arab governments. It found allies and support among non-Arab terrorist groups, rarely, if ever, obtaining money from Arab states, but deriving main support from China and North Korea. It displayed on the whole an attitude of distrust and hostility toward existing Arab regimes, deeming them bastions of reaction that would support Palestinians only when narrow national interests were furthered (or at most not impaired) by such support.

The contrast between Fatah and most other fedayeen groups on the one hand, and the PFLP (along with an offshoot, PDFLP—"Popular Democratic Front for the Liberation of Palestine") on the other, was vivid during events in Jordan in the summer of 1970 which have been explored at some length in this case. In that summer, when American initiatives produced Israeli-Egyptian and Israeli-Jordanian cease-fires, and thus threatened to soften the line of unyielding determination to destroy Israel, substantially all fedayeen groups fought the movement toward accommodation. At the same time Al Fatah and the bulk of the others maintained essentially their professed policy of noninterference with Arab governments. The PFLP and the PDFLP called, however, for revolutionary ouster of Jordan's Government. More clearly reflecting the division, the PFLP assailed the PLO and Al Fatah as petty bourgeois groups, essentially enemies of primary PFLP objectives.

For some time before the summer of 1970, the main concentrations of fedayeen were in Lebanon and Jordan. Again, the available numbers are far from precise. Weighing the various estimates in the record, however, it appears that there were, adding all the various organizations together, approximately 12,000–15,000 fedayeen in Jordan and substantially fewer in Lebanon. The PFLP appears to have numbered

---

7. The quoted language is from a talk given by Dr. Habash in Amman on June 5, 1970 ("on the commemoration of the third anniversary of the 1967 defeat"), entitled "THE MAIN ENEMY: IMPERIALISM."

about 400 to 800 in Jordan and 200 to 400 in Lebanon.

The fortunes of the fedayeen, and of the divergent groups among them, ran a checkered course. To concentrate mainly upon Jordan, which has been the main setting of evidence adduced in this case, the government of that country was never wholly comfortable about its fedayeen guests or their activities. In the months immediately after the 1967 war, fedayeen forays into Israeli territory were of minor significance in numbers and military impact, but they led to retaliatory attacks upon Jordanian settlements and installations. The government of King Hussein reacted by seeking—through combinations of persuasion, threats, entreaty, and physical obstruction—to discourage fedayeen raids across the Israel-Jordan border. In March of 1968 a battle with Israeli troops was fought by forces of the Jordanian army combined with fedayeen members. The engagement, viewed as a notable success in Jordan, enhanced fedayeen prestige, rendering temporarily less feasible and desirable tactics of opposition to the fedayeen by the Jordanian Government.

In July of 1968, the fedayeen organizations became members of—and soon, to a considerable degree, came to control —the PLO. Yasser Arafat became, first, chairman of the Executive Committee and, in February 1969, chairman of the PLO. The dominant position of Fatah was reflected not only in Arafat's top position but in its bloc of votes in PLO's highest authority, the Palestine National Council. Thus, in the Seventh National Council session at Cairo held May 30–June 4, 1970, Fatah held 33 of the 112 seats. Other fedayeen groups were allotted substantially smaller numbers of seats—viz., 15 for Sa'iqa, 8 each for the PDFLP and the PFLP, and declining allotments to others. Illustrating its characteristic posture of basic independence and revolutionist rigor, the

PFLP sent only a single delegate in an ostensible display of reserved and limited solidarity.[8] That delegate, likewise in the accustomed style of the PFLP, proceeded to distribute large amounts of propaganda materials, hold press conferences, and generally achieve a disproportionate degree of visibility and audibility.

In the years from 1968 through 1970, while they comprised a weighty portion of the PLO, the fedayeen groups continued as a shifting, sometimes competing, often not clearly distinguishable welter of organizations. Much of the evidence before the court, especially as developed and shaped on behalf of the all risk insurers, has dealt with the "fedayeen" as if they were a single or unitary group. To a considerable degree it has not seemed possible to be more refined and discriminating. Moreover, to present adequately the picture on which the all risk insurers rely, the court will follow here to some extent the practice of describing generally "fedayeen" activities and impacts. In the final analysis, however, the PFLP's modest size, its ideological separateness, its minority position, and, in vital respects, its hostility toward all or most of the other members of the fedayeen movement become matters of moment for the decision herein.

With that important caveat, we resume our sketch of fedayeen history, striving to keep it within the narrowest dimensions reasonably possible for our purposes. Omitting comparable, but not centrally material developments in Lebanon, we recall that in the years 1969 and 1970 mounting tensions developed in Jordan, and more generally in the Arab world, as a result of the fedayeen presence and pressures. The fedayeen, often wearing uniforms in the style of combat and camouflaged fatigues, and commonly carrying small arms, were visible in numbers in the cities of Jordan. In 1970 they came increasingly to assume control over administration and disci-

---

8. The record suggests that the PFLP's limited participation in the Seventh Congress also reflected its annoyance with not receiving representation equal to that of Fatah and Sa'iqa.

pline within the refugee camps. With the not necessarily enthusiastic acquiescence of the Jordanian Government, fedayeen vehicles bore their own license plate identifications. Camps for military training, particularly for commando-type operations, were run and exclusively controlled by fedayeen organizations.

Moving toward the summer of 1970, particular and severe tensions developed between the fedayeen and Jordan's government around their evident differences over possible dealings with Israel. The fedayeen opposed bitterly restrictions upon their efforts to conduct guerilla-style operations in Israel.[9] They wished to see continued and enhanced the pattern of armed encounters, by air and on land, between armed units of Israel on one side and those of Egypt, Syria, and Jordan on the other. They sought to prevent, and then violently denounced, the cease-fire arrangements, largely credited to the efforts of Secretary of State Rogers, executed by both Egypt and Jordan with Israel, and effective on August 8, 1970.

In the spring and summer of 1970 there were armed clashes between fedayeen and Jordanian security and army forces.[10] Some fedayeen were taken as prisoners. In June 1970 portions of the Jordanian capital, Amman, were "occupied" by fedayeen, who demanded, *inter alia*, changes in the Jordanian cabinet. Members of the PFLP seized two major hotels in Amman and held the occupants as hostages until after the King acceded to some of the fedayeen demands. While the June outbreak ended with an agreement, that did not last long. As the work of Secretary Rogers approached and achieved the cease-fires, the unrest resumed, and there was more gunfighting, but not on the June scale until after September 1970. The fedayeen established armed enclaves within Amman, in the refugee camps, and elsewhere. Demonstrations and literature featured denunciations of King Hussein as a traitor. At least one armed attempt on his life in early September was attributed to the PDFLP.

There prevailed, in sum, a condition of considerable unrest, commotion, and danger within Jordan. Fear and uncertainty ran high. Schools and businesses opened and shut sporadically as violence erupted and rumors flew. Fedayeen groups set up road blocks on city streets and highways, competing with the police for control.

The questions of whether or how to suppress or regulate the fedayeen had elements of difficulty and delicacy for King Hussein considerably graver than those that would have been generated by the fedayeen considered alone. Divisions among the Arab governments were serious factors. The militant stands of the fedayeen—against cease-fires with Israel and, more broadly, against the efforts of American "imperialism"—were strongly supported by such countries as Syria and Iraq. An armed showdown with the fedayeen could mean, as it did in the event, intervention by forces of the Syrian and Iraqi armies. What Russia might do and how the United States might react were among the welter of staggering questions without clear answers.

At any rate, the Government of Jordan concluded in September of 1970 that the fedayeen must be forcibly suppressed. On September 17, the army attacked in Amman and elsewhere. After international maneuverings beyond our concern and depth, Syrian and Iraqi invaders were repelled or withdrew. With large numbers of casualties among both the fedayeen and the army forces, and widespread destruction of property during 10 days of heavy fighting. King Hussein re-established firm control of

---

9. In the period of about 18 months ending in August 1970 there were an estimated 100 "incidents" in Israel involving PFLP members, and almost 100 of them were killed.

10. Events of this period are further elaborated later, in considering the asserted exclusion of the plaintiff's loss as due to "insurrection" or "rebellion."

his state. Under the watchful attendance and pressures of other Arab governments, a cease-fire was arranged with the fedayeen. Like others, this arrangement was only intermittently respected. Armed outbreaks recurred sporadically, but the power of the fedayeen in Jordan had been crushed and they were driven out of the country by the following summer.

In all of the foregoing fedayeen history in Jordan, our record reveals the roles of the PFLP as relatively subordinate, separate, often tangential, and concentrated primarily upon the organization's own advancement and unique objectives rather than any general program of "fedayeen" efforts viewed as a unified or coherent whole. The PFLP membership was small. Its tactics of propaganda and terror were often dramatic and may have had effects greater than groups of comparably small size seemed able to achieve. Nevertheless, the PFLP largely went its own way and accounted for results minor in the total picture. An important reflection of the organization's independence and isolation, significant for the instant case, is the fact that hijackings and other so-called "external operations" (outside Israel and the area around it) were unique tactics of PFLP terrorism, almost uniformly opposed, and certainly not participated in, by the other, far more numerous fedayeen groups. Such external operations (totalling not more than about 10 before September 6, 1970) included, on PFLP's proclamation of its achievements, hijackings of Israeli (El Al) airplanes from European airports, the planting of bombs in London ("Zionist") stores and offices, and attacks upon Israeli embassies in Europe. The paramount goals of these ventures, as understood and expressed by PFLP leadership, were effects upon the Palestinians themselves rather than upon others. However horrible for individual victims, the violent assaults were recognized as trivial in terms of conceivable pressures they might exert upon "imperialist" enemies like Britain and the United States.

George Habash saw the struggle as a long one—"twenty more years [of] * * * sacrifices and bloodshed"— viewing in the perspective of anarchists and other violent revolutionists the activities by which the PFLP was "inflicting slight damage to the enemy here * * * and * * * there * * *." While PFLP leaders talked of "dramatizing" the Palestinian cause to Americans, the British, and others, they recognized that the reactions would tend to be hostile rather than favorable. On the other hand, with morale among Palestinians exceedingly low in the years after 1967, and especially so during the developments of 1970, terrorists acts like those of the PFLP were intended to instill pride, bolster spirits, generally to inspire and be applauded by the fedayeen and the Palestinian masses.

### Other Hijackings of September 6 and 9, 1970

The hijacking that concerns us was an improvised alternative after unforeseen events had blocked the planned participation of its two perpetrators in the attempted taking of an El Al airplane. The frustrated plan appears in turn to have been part of the PFLP's efforts to achieve a "sensational" display of daring and horror through the capture of several large airplanes filled with civilian passengers on a single day.

The record before us seems to show that hijacking of airplanes was a device specially cherished by the PFLP during the times in question. The organization employed for these actions a few people who had acquired some knowledge of jet aircraft structure and functioning.

On or shortly before September 6, 1970, a band of armed PFLP members went to an abandoned airstrip in northeast Jordan which had been known as Dawson's Field during World War II. The area was desolate. The long-abandoned strip was a rudimentary one, not improved by long disuse. There were no airport structures or facilities. But the unprepossessing place was soon to be named the "Airfield of the Revolution"

and to become a focus of much attention and publicity, as well as some considerable fear and discomfort, all as substantially planned, entirely on their own and apart from other fedayeen groups, by PFLP leaders.

Shortly after 11:00 A.M. Greenwich Mean Time a Trans-World Airlines (TWA) flight (a Boeing 707) left Frankfurt, bound for New York. Within an hour, two of its passengers produced hand guns and grenades, took command of the airplane, and required it to proceed to and land at the airstrip in Jordan. At 12:39 P.M. a Swissair Douglas DC 8 left Zurich for New York. This airplane was hijacked in similar fashion by a man and a woman and likewise flown to Dawson's Field. At some time before 1:00 P.M. on the same afternoon an El Al flight left Amsterdam. A man and a woman attempted to hijack it when it reached the vicinity of London. They met with resistance, however; the man was killed, the woman captured, and their attempt was foiled. These unsuccessful hijackers, like those who had taken the TWA and Swissair planes, carried a flight plan to Amman and an aviation chart. They also carried weapons like those used by the others.

On September 9, 1970, a BOAC VC–10 was hijacked by two men during a flight from Bahrain to Beirut. The methods and incidents were like those of the September 6 episodes. This airplane was also taken to Dawson's Field, where the two earlier planes were still sitting, with most of their passengers still aboard, held by armed PFLP members, in turn surrounded, at a distance, by Jordanian troops.

As has been indicated, the course and details of the hijackings to Dawson's Field followed a pattern. Apart from the hijacking techniques and procedures, the hijackers dealt similarly with passengers and crew. Passports were taken. Israelis and Jews of other nationalities were singled out for special treatment. The passengers, during the flight to Jordan and on the ground thereafter, were told of, and were lectured upon, the Palestinian cause, its merits and its enemies.

With some of the passengers released during the course of the sojourn while others remained there throughout, the hijacked airplanes stayed on the airstrip until September 12. The captors negotiated during that time to exchange airplanes and passengers for ransom money and the release of prisoners held by several countries, including Israel. On September 12, the negotiations having failed, and with the Jordanian authorities pressuring the captors, the passengers were removed and the airplanes were destroyed. The remaining passengers were taken to Amman where many of them were to huddle in improvised prisons, suffering fear and severe physical privations, while the bombs and gunfire of the battle between Jordan's army and the fedayeen exploded around them.

The PFLP was isolated and condemned among the fedayeen for the hijackings. The PLO castigated the hijacking "venture" as a misguided "gamble with the fate of [the Palestine] revolution * * *." Both Al Fatah and Sa'iqa likewise denounced these terrorist actions as injurious to the general cause of the Palestinians. The PDFLP, though perhaps more strictly leftist-revolutionist than the PFLP, had consistently criticized the latter's external operations as publicity-seeking "acts of individual terrorism," and it joined in condemning the Dawson's Field adventures. The Commanding General of the PLA, as he was later to recount at our trial, went to Dawson's Field to plead in vain for release of the airplanes and passengers, sharing the general Arab view that the hijackings, apart from morality, were counterproductive for the Palestinian cause. The PFLP remained defiant and independent, bearing without strain a temporary suspension from the PLO. Explaining the PFLP position on the hijackings at one of numerous press conferences, a spokesman justified this key "point of difference" with the other fedayeen as an exercise of "the right to

have its own activities according to its own convictions."

*The hijacking in this case*

Two black men (apparently not Arabs), traveling with Senegalese passports bearing the surnames Diop and Gueye, were assigned by the PFLP to participate in the attempted El Al hijacking, described above, which was destined to fail on the afternoon of September 6, 1970. They made reservations for an August 30 flight, later changed to September 6, 1970. When the reservations were first made, however, an El Al security man became suspicious because Diop did not seem "thin-boned and tall" enough to be Senegalese. He reported his doubt to Zeev Goldberg, an Israeli government security officer assigned to El Al. Goldberg in turn reported to the home office as well as to the Dutch police, who were asked to investigate Diop and Gueye. On September 3, the El Al home office directed that the two be barred from the company's aircraft. Goldberg told the police that inquiries were no longer necessary. He never suggested that continued investigation might be desirable because Diop and Gueye had tickets soon to be endorsed over to other airlines. While some of the details are unclear, Goldberg never conveyed timely indications to anyone of his and his colleagues' suspicions. In fact, however, his own suspicions were limited to the point of nonexistence. He regretted the loss of revenue for El Al. And he feared—understandably at the time, whatever hindsight teaches—that reports of beliefs and suspicions might lead to suits against El Al.[11]

Obeying orders, El Al's Amsterdam staff told Diop and Gueye on September 4 that the flight they had reserved was full, but that three other airlines had flights to their purported destination, New York, at about the same time. As a further accommodation El Al made reservations for the two on all three flights, including the plaintiff's. And their tickets were marked with "open endorsements," naming no specific endorsee carrier.

Diop and Gueye appear to have reported these developments to their PFLP superiors, and they were either ordered or permitted to board and hijack the Pan American airplane. When a Pan American agent checked with Goldberg, the latter assured him that the only reason for the transfer was that El Al's flight was full. Goldberg himself was, of course, sensitized to hijacking dangers both by profession and by nationality. But he perceived in the setting of time and place that the threat was mainly (or, as he said, "only") to Israeli airplanes. When he observed the apparent indifference of Diop and Gueye to what airline they took, he was persuaded that they were acceptable passengers and that his government was needlessly losing money by not carrying them.

At about 2:00 P.M. Amsterdam time H. C. Langenheim, ranking Dutch police officer on duty at Schiphol Airport, received word that there had been an attempt that day to hijack an El Al flight out of Amsterdam. He went to inquire of El Al about this and spoke to Goldberg. Goldberg said, without explaining why, that the two of them should repair to the Pan American office. As they proceeded in that direction, though not at a breakneck pace, Goldberg mentioned Diop and Gueye as suspicious people. When Langenheim asked why, Goldberg told him to ask his own superiors, Major

---

11. The rather detailed account of the hijacking on which we are now embarked is given because the Government charges plaintiff's employees with negligence (a charge in which the war risk insurers join) and even with wilful misconduct (in which charge nobody joins) for alleged insufficiency of their precautions against the hijacking. The findings at this point are the grounds for rejecting these charges.

It may also bear mention that this subject, like others, must be considered in the context of its time. What suspicions or precautions would be expectable today might be a sharply different matter.

Gerritsen and Mr. Roovers.[12] Adopting that suggestion, Langenheim separated from Goldberg before they had reached Pan American's office and went back to his own. He learned from Major Gerritsen that there was no information warranting suspicions about Diop and Gueye.

As the events continued to unfold speedily, both Goldberg and Langenheim moved with remarkably contrasting deliberation. Neither was willing to risk embarrassment or worse by what might be precipitate action upon groundless suspicion. Each passed the buck to the other. Goldberg evidently knew very little, and told Langenheim less than he knew. Langenheim, who could have stopped the takeoff if he saw any ground as a reasonable police officer to do so, never came close to taking such action. Nobody in plaintiff's ground staff at Amsterdam had reason to behave differently, or to take more precautions, than he did.[13]

In any event, skipping details of Langenheim's and Goldberg's leisurely progress (which neither was able even at the trial to reconstruct as significant efforts to warn of, or avert, the danger we now know), the record shows that minutes before takeoff, plaintiff's pilot, Captain Priddy, received word on the ground control radio that there were two suspicious men, Diop and Gueye, aboard and that these men had been refused passage by El Al. He had them paged and met them on the lower level with others of the crew accompanying him. He told them courteously that he would have to search them or return the aircraft to the terminal. They consented quietly and were searched. Nothing suspicious was found on their bodies. The purser searched their seats with similar results.

When the captain returned to the cockpit, his first officer and engineer reported that word had been received of an attempted El Al hijacking that morning. With the information then accumulated the Captain and crew discussed the safety of taking off. Captain Priddy, whose wife was aboard as a passenger, told them of the search he had made, and all agreed that there was no reason for concern. It was noted among them, as Zeev Goldberg was later to testify, that Palestinian threats to El Al were not threats to an American airplane headed to New York.[14] The crew also deemed it reassuring that the two alleged suspects, having been seen and searched, appeared quite clearly not to be Arabs. If it did not supply further comfort, the delicacy of the situation—with the possibility of what might become a racial incident after the insistence upon a search that was at least debatable, cf. United States v. Ruiz-Estrella, 481 F.2d 723 (2d Cir. June 11, 1973)—was also a factor in Captain Priddy's judgment. All concurred in the decision to take off.

It was soon to be learned that Captain Priddy's search had failed to disclose the weapons Diop and Gueye were carrying in crotch holsters. Brief hours before that, a more professional search, by tensely alert El Al personnel, had passed over similarly concealed weapons carried by those who had attempted the hijacking near London. And three days later, after the stunning events of September 6, two BOAC passengers likewise were searched and likewise took weapons from crotch holsters minutes later to

---

12. Goldberg had already been told that the Dutch police had learned nothing adverse about either Diop or Gueye.

13. The Government stresses, *inter alia*, that Diop and Gueye were ticketed to fly on from New York to Santiago, Chile; that they lacked American visas and may not have had confirmed reservations to Santiago; and that plaintiff was (or might be) in violation of immigration regulations in allowing them to proceed in these circumstances. As an asserted basis for finding "negligence" in any sense pertinent here, the point is unsubstantial.

14. Prior to that day only one non-El Al airplane had been hijacked by Palestinians, and that (a TWA flight) had been en route to Tel Aviv.

commandeer the airplane and take it to Dawson's Field.

To resume the central story of this case: Diop and Gueye, having been ordered in a last-minute shift to take the Pan American aircraft, were not briefed and equipped as fully as the other PFLP hijackers in the other seizures on that day. They had no route maps or certain plans. They assumed, as did their superiors, that the destination would be Dawson's Field. But they assumed as a basis for this that they were taking a 707 rather than the far larger (and costlier) 747. There was no plan prior to their boarding to land in Beirut or thereafter in Cairo. That course, eventually followed, was hastily improvised as the project developed.

At any rate, about 45 minutes out of Amsterdam, Diop and Gueye drew their weapons and took charge. They ordered the airplane turned and flown toward Beirut. Initially tense and nervous, they grew calmer after a while. Speaking on the public address system and to individual passengers, they identified themselves as being with, or working for, the PFLP. They explained their opposition to the American government for its support of Israel and told of the hardships and injustices suffered by exiled Palestinians.

At the hijackers' command, the crew collected all passports. These were examined by Diop and Gueye, who interrogated particularly some of the Jews, military and diplomatic persons, and some others.[15] It was not PFLP policy to maltreat individual passengers, whether Israelis or others. According to the organization's propaganda, it was "conscious of the fact that the class struggle will develop in Israel. We want to win these passengers to our cause."

In radio conversation with Beirut, the hijackers demanded that PFLP representatives be brought to the airport to speak with them. The demand was met. In ensuing radio exchanges the hijackers reported that they had a 747, not a 707, and that the airplane was too large to land at Amman. After initial Lebanese refusals to allow a landing, threats to destroy the airplane in the air, and a request from the American embassy, the airplane finally was allowed to land at Beirut, but with the understanding that it would refuel there and fly on to another place.

While it circled Beirut, the airplane received a radio message from Israel inviting a landing in that country and offering a fighter escort. Gueye threatened to blow up the airplane if it veered toward Israel. The invitation was not accepted.

At the Beirut airport a total of six to nine other members of the PFLP came aboard, bringing elated greetings and more guns.[16] Instructions had evidently come to this Beirut group, as well as to Diop and Gueye, from Amman. 20 minutes or so after the landing, a load of explosives, which had been hastily procured from someplace in or near Beirut, was brought onto the airplane. Some of the new arrivals went among the passengers and argued the Palestinian and anti-American cause. This group also helped to prepare and distribute the explosives.

When it came time to leave Beirut, all but one of the PFLP people who had boarded there left the aircraft. The one remaining appeared to be a demolition expert. After the takeoff and en route to Cairo, placing of the explosives was completed. The hijackers told the crew that they would have eight minutes after landing to evacuate the aircraft before it was blown up. The passengers were briefed and organized to cope with that schedule.

15. Israelis and people with U.S. passports believed to have dual Israeli citizenship were likewise singled out (and treated with special rigor) on the Swissair and TWA airplanes hijacked to Dawson's Field.

16. In addition to this group a Lebanese colonel boarded the aircraft to ensure that the plane would leave after refueling.

During the flight to Cairo one of the hijackers undertook to read a statement to the passengers over the public address system. The effort failed because of a mechanical difficulty, but similar sentiments had been, and continued to be, conveyed in direct talks to the passengers and crew. The text, preserved by a crew member, said:

"PFLP is speaking.

"Why do we take the airoplane? We took the American airoplane because the government of America helps Israel daily. The government of America gives Israel fantom airoplanes which attack our camps and burn our village. We—the Group of AKA—which is following for p. f. l. p. know that by warning the people of America for the crimes and murders which is committed always in Palestine and Vitnam—makes him feel how his government helps Zionism.

"We left our homes, and our lands of 20 years old. Every day the Jews attack us—in our camps.

"We think that by our work make you know the truth.

"We are sorry for what we made of disturbance—but you must understand us."

The Egyptian Government at first refused permission to land at Cairo, but allowed this after being impressed with the state of emergency on the airplane. As has been mentioned, the fuses were lit before landing. There was some panic, some crying, mostly good order, and some injuries as the passengers made an emergency evacuation. There was gunfire, including tracer bullets, from an area away from the aircraft.

*Character and purposes of the hijacking; a summary for purposes of this case*

All the evidence of history, ideology, armed combat, and political struggle in this case has been adduced, of course, to support competing arguments as to whether the destruction of the airplane in Cairo should be deemed a "loss * * * due to or resulting from * * * capture, seizure * * *, war" or one of the other exceptions to coverage in the all risk policy. While the war risk defendants have taken a divergent view on this, plaintiff and the all risk insurers are agreed that the nature of the PFLP, its roles in the Middle East conflicts, and its reasons for the hijacking are material considerations. The court has accepted this premise.

It becomes useful on this basis to summarize briefly, in one place, the essential character and motivations of the PFLP and the hijacking in question. As to the PFLP itself, this was a relatively small organization led by dedicated revolutionists whose major commitments were to the "class struggle" and the "war" against "imperialism." The PFLP went largely its own way, following its own doctrines and tactics, competing for the allegiance of the Palestinian masses, opposing other fedayeen groups and the Arab governments much of the time. Particularly in respect of its "external operations"—ranging from the hijacking of airplanes to bombings of European embassies and offices by PFLP "cubs"—it pursued its own, separate, independent activities, in opposition to the beliefs and programs of substantially all the other fedayeen.

It is not sound, therefore, to attempt, as have the all risk insurers, to treat the hijacking as somehow the work of "the fedayeen," integrated with and inseparable from the whole course of actions by that overwhelmingly larger and largely different melange of Palestinian organizations. It is not accurate or acceptable to say, as these insurers do, "that the seizure and destruction of the aircraft" are properly to be viewed as "acts * * * merged in the Jordanian insurrection and warlike activity against Israel." [17]

In fact, the hijacking was the work of a relatively minuscule, militarily impotent, essentially isolated group of dedi-

---

17. All Risk Defendants' Post-Trial Memorandum 3.

cated revolutionists pursuing long-range objectives. The hijacking of interest here, like other acts of terrorism,[18] was designed to serve as a spectacular display, as a round of "symbolic blows," [19] as propaganda of a vividly compelling sort. The central and overriding effect was to be a spiritual lift for Palestinians generally and, more importantly, a demonstration of the "heroism" of the PFLP. With Palestinian morale at a low ebb, the demonstration of imperialist vulnerability was designed to raise hopes, enhance PFLP prestige, heighten "class awareness," and thus help to rededicate and further the long class struggle. In the underlying revolutionary philosophy, "one such sensational blow [was] worth more, from the point of view of its far-reaching effects and the information value, than dozens of Press attaches or Cultural attaches on which nations spend colossal sums of money that could better be used in the service of the Palestine revolution!" This "propaganda of the deed," as plaintiff labels it in Kropotkin's phrase, is neither novel nor unique for small groups like the PFLP which are at least generations away from, and not remotely equipped for, the grand revolutionary designs they may envision. There were elements in these actions of a "desperate nihilism," to employ the characterization of a not unsympathetic all risk witness. But on the positive side, whether misconceived or not, acts of terror were seen as "spreading the right revolutionary climate," conditioning "the masses," and, above all, teaching that the PFLP was the leader to join or follow.

PFLP leaders had. no illusions that the hijacking of an American airplane from a European country could be thought of as "war" or "warlike operations" against the United States or Israel any more than such labels could apply to bombing European stores or offices. If it had been otherwise, we could not in any event follow illusions for the construction of insurance policies.

Similarly, contrary to contentions of the all risk insurers, the hijacking here in question had substantially nothing to do with Jordan. It seems evident, to be sure, that Diop and Gueye had been scheduled to take another airplane and probably to hijack it to Jordan. It may be, too, that the 747 would have been flown to Jordan had that been feasible. But it could not be and it was not. When we deal with such sudden, wanton, opportunist acts of improvised terrorism, at least for insurance purposes, we must surely stay close to what happened rather than to what might have happened. The terrorists themselves did so. As the hijacking progressed, when they found Jordan unreachable, they might have stopped in Beirut, left the aircraft intact in Cairo, or done any number of other things. What they actually did may have served a little, or been intended, to embarrass the Egyptian Government, to annoy the United States, and to frighten a load of passengers. But, as their own propaganda and characterizations made clear, they did not even pretend to be affecting events in Jordan or any hoped-for progress toward revolution or civil war in that country.[20]

18. "Terrorism" and "terrorist" are the apt words employed by witnesses from every quarter for the PFLP's "external operations." They are, for most of us, pejorative terms, but the court adopts them because they are accurately descriptive. No party to the case has found it necessary or possible to take a benign, or even a neutral, attitude toward terrorism. Without striving for an unmanageble excess of impartiality, the court recalls, as everyone knows, that the desperate tactics of terrorism have been employed by a wide range of sects and groups—including, e. g., the Sinn Fein, the Stern Gang, and an array of anarchist organizations. See J. B. S. Hardman, Terrorism, 14 Encyc.Soc.Sci. (1934).

19. Here and elsewhere in this paragraph quotations are from PFLP literature and spokesmen unless otherwise characterized.

20. This is not to suggest that the hijackings to Dawson's Field would be deemed "due to * * * civil war, revolution, rebellion, insurrection or warlike operations * * *." It is sufficient to observe that a pertinent relationship to Jordan is impossible to find in the hastily devised hijacking that led to this case.

## II. LEGAL CONCLUSIONS [21]

*Some general principles and their application here*

The all risk insurers state their overall position as follows:

"The all risk defendants rely on the following clauses in the exclusions of their policies:

'This policy does not cover anything herein to the contrary notwithstanding loss or damage due to or resulting from:

1. capture, seizure . . . or any taking of the property insured or damage to or destruction thereof . . . by any military . . . or usurped power, whether any of the foregoing be done.by way of requisition or otherwise and whether in time of peace or war and whether lawful or unlawful . . . ;

2. war, . . . civil war, revolution, rebellion, insurrection or warlike operations, whether there be a declaration of war or not;

3. . . . riots, civil commotion.'

"The all risk position is that the clauses in paragraphs 1 and 2 quoted above are fully applicable to the seizure and destruction of Pan American's aircraft. This would relieve the all risk defendants of any liability to Pan American and would impose liability on the war risk defendants.

"The all risk defendants also assert a secondary position, that if the loss was not totally excluded under the quoted provisions in paragraphs 1 and 2, it falls within the clauses in paragraph 3." [22]

As the argument is elaborated, the claimed series of alternative or cumulative exclusions seems to be narrowed somewhat: the detailed contentions in these defendants' learned briefs [23] invoke as applicable exclusions the words "insurrection," "rebellion," "civil war," a "taking * * * by [a] military * * * or usurped power," "warlike operations," "war," "riot," and "civil commotion." It has been suggested that this mode of argument in the alternative might itself be deemed to reflect ambiguities and uncertainties that militate against all risk insurers seeking insulation by exclusion clauses. See Sincoff v. Liberty Mut. Fire Ins. Co., 11 N.Y.2d 386, 390, 230 N.Y.S.2d 13, 183 N.E.2d 899 (1962); Silverstein v. Commercial Cas. Ins. Co., 237 N.Y. 391, 393, 143 N. E. 231 (1924). The thought is not inapposite but it plays an extremely modest part in this case. It serves at most to reinforce conclusions more comfortably drawn from extra-litigation facts in the light of familiar canons for construing insurance policies as well as other documents.

21. There is apparent agreement that New York law should govern the private policies and, probably, that "federal common law" applies to the government insurance. Having so agreed, the parties, dealing with international insurance (and insurance clauses) used in a large part of the world, cite cases and materials from all over. The court has studied and undertaken to apply the resulting syntheses. It has not appeared after all that choice of law is a decisive topic. It is, moreover, a somewhat artificial topic. In transactions of the type before us, far transcending state or national borders, the concern should be more for uniformity and, if possible the ascertainment of generally accepted doctrine than for some provincial source of law. See Republic of China v. National Union Fire

Ins. Co., 151 F.Supp. 211, 226 (D.Md.1957) (Thomsen, C. J.), rev'd in part on other grounds, 254 F.2d 177 (4th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958).

22. All Risk Defendants' Post-Trial Memorandum 9. The "secondary position," as has been mentioned, would impose liability upon some of the all risk defendants to a maximum of some $10,000,000. The result reached by the court obviates this possibility.

23. This is a case for expressly avoiding *expressio unius* speculations. All the briefs, like the conduct of the trial generally, have been immensely scholarly and interesting, though, inevitably, not pithy.

The all risk defendants have accepted from the outset the burden of proving the factual contentions upon which they would rest one or another of their exclusionary theories. They have resisted, however, the application here of the standard doctrine that doubts and ambiguities should be resolved against the insurer, especially where the question is as to exceptions from the coverage of "all risks." While this does not seem in the end a decisive concern—i. e., the court reaches the interpretations hereinafter reported essentially upon grounds more particular than the ancient canons—it should be recorded that the all risk view of the general principles has been rejected.

 New York, like other jurisdictions, follows the rule that coverage terms "capable of more than one meaning" should be construed favorably to the insured. Sincoff v. Liberty Mut. Fire Ins. Co., *supra*, 11 N.Y.2d at 390, 230 N.Y.S.2d at 15, 183 N.E.2d at 901. This familiar principle means normally that an exclusion from general coverage will be effective only when it is clear, explicit, and unambiguous. Feeney & Meyers v. Empire State Insurance Co., 228 F.2d 770, 771 (10th Cir. 1955); Republic of China v. National Union Fire Ins. Co., 151 F.Supp. 211, 235, 237 (D. Md.1957) (Thomsen, C. J.), rev'd in part on grounds reinforcing this principle, 254 F.2d 177 (4th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958); *Sincoff, supra*, 11 N.Y.2d at 390–391, 230 N.Y.S.2d 13, 183 N.E.2d 899. Cf. Bushey & Sons v. American Ins. Co., 237 N.Y. 24, 27, 142 N.E. 340, rearg. denied, 237 N.Y. 536, 143 N.E. 732 (1923). Where the risk is well known and there are terms reasonably apt and precise to describe it, the use of substantially less certain phraseology,

upon which dictionaries and common understanding may fairly differ, is likely to result in interpretations favoring coverage rather than exclusion.

These generalities have an adverse impact upon the all risk defendants. As reflected by their array of alternative proposals in this case, the words of exclusion upon which these defendants rely are not in any instance applicable with a comfortable degree of aptness to the circumstances of the disputed loss. Indeed, if there were no canons of construction either way, the court would find the balance of persuasion leaning toward coverage rather than exclusion. But postponing that, it must be deemed significant that (1) we are dealing with a risk well known when the insurance was written,[24] (2) there were expressions known to the insurers, considered by them, and used in other policies by some of them or others in the industry that described this kind of risk with clarity and precision, and (3) these insurers themselves recognized the ambiguities in their ancient, boiler-plate clauses and themselves exhibited the consequent uncertainties.

For all the effort to stretch terms like "war" and "warlike operations," or to transplant an inchoate Jordanian "civil war" in time and space, we are dealing with a hijacking engineered by a small political group as a random and hastily improvised instance of its program of terrorism. The notions of "hijacking" and "terrorism" were perfectly familiar at the times in question, describable in plain terms responsive to wide experience. These were matters contemporaneously vivid to the all risk insurers, pondered by them, and solved (both before and after the operative events) by insurance clauses strikingly more certain than the exclusions involved here.[25]

---

24. The evidence contains at least one exhibit to show what the court could probably confess it noticed in any event—that international hijacking, often committed for political or revolutionist causes, has been for some years a problem of "disturbing frequency," considered as such, if not with profound effects

thus far, by the United Nations and other international agencies.

25. Undertaking to distinguish Sincoff v. Liberty Mut. Fire Ins. Co., *supra*, the all risk defendants describe it as a case where "the risk * * * was well known and could have

A leading underwriter for the second claim (all risk) defendants expressed early in 1968 the common awareness of risks arising from the unpredicatable prospects of violence centering in the Middle East. Politically motivated hijackings were already well known by then. In August 1969, three months before inception of the instant policies, a TWA airplane en route from Rome to Athens was hijacked to Damascus, evacuated in emergency circumstances, and then severely damaged by explosives. The PFLP claimed credit for this achievement. The war risk insurers disclaimed liability. The all risk insurers, because of a deductible arrangement, were not exposed to arguable liability. The dramatic, highly publicized, and sharply pertinent experience might thus have been employed, without fear of an adverse inference, to change existing exclusions. No such steps were taken generally until shortly after the instant loss. But there were clear expressions of uncertainty in the all risk ranks and even revised exclusion clauses employed in other policies issued by different insurers which would have applied to this case. A difficulty for the present all risk defendants is that they did not employ such revisions.

The failure to do so was not due to any confidence that the ancient exclusion clauses were sufficient for the purpose. On the contrary, the all risk insurers recorded significant industry recognitions that the clauses were not sufficient, or at least subjects of grave doubt. So, for example, in a May 1970 meeting of the United States Aircraft Insurance Group (U.S.A.I.G.), the Association of our first claim defendants, there was discussion later summarized in a written report under a heading interesting in itself:

> "Political Risks (War, etc., Strikes, Riot, *Hijacking*, Confiscation)" (emphasis added).

The summary says *inter alia* (emphasis added):

> "The status of political risks exposures was reviewed. At earlier meetings the Managers reported that reinsurers had expressed an intention of introducing a modified war risk exclusion into the Group's 1971 treaties. One of the objectives of the change was to exclude strikes, riot, *hijacking and political risks exposures as well as the traditional war exposures*. USAIG is not knowingly at risk on any of the traditional war risk exposures that would be mandatorily excluded under the language proposed by treaty reinsurers but USAIG is at risk on some of the other categories involved (i. e., strikes, riots, civil commotion, etc.) *Additionally, there is a problem of defining the various kinds of political risk in words descriptive of today's world events.*

\* \* \* \* \* \*

> "*Current war risk exclusions do not appear to be effective against intentional damage such as might be caused by hijackings, by bombs placed in aircraft by political activists, by riotous acts, etc.* Notwithstanding this, war risk rates (and conditions of coverage) are more responsive to world unrest than are the aircraft hull rates. Accordingly, studies are in process to determine the feasibility of segregating the 'non-war intentional damage' exposures from both the 'operational' coverages and the "war" risk coverages with the expectation that this 'non-war intentional damage,' if properly insurable by the aviation market, would carry a separate rate and appropriate cancellation and catastrophe limitations."

Called as a hostile witness by the war risk defendants, the president of a corporation serving as underwriters for U. S.A.I.G. testified that the observation in the last-quoted paragraph that

been excluded by using a less vague term," citing, then, examples of such better terms given by the New York Court. Reply Memo-

randum 4 n \*\*. The attempted distinction is unsuccessful in the judgment of this court.

**1120**

"[c]urrent war risk exclusions do not appear to be effective against intentional damage such as might be caused by hijackings," etc., reflected what we would call ambiguity—namely, that these "existing clauses" (including the ones in this case) "were not effective as far as resolving disputes of whether or not it should be a war risk coverage or whether it was an all risk coverage."

The significance of such expressions is not diminished by the fact that they were recorded after inception of the policies in suit, though it is worth noting that they preceded the loss. It would be difficult to posit more cogent evidence of uncertainty (ambiguity) than the contemporaneous observations of the insurance industry itself.

The London all risk insurers were circulating, debating, and actually writing before November 1969 exclusion clauses descriptively labeled "War, Hijacking & Other Perils Exclusion." Such clauses were known to and considered by the American all risk insurers as well. A draft version of March 1969, which would clearly and simply have accomplished the exclusion claimed under other words by the all risk defendants here, is important enough to set out in full:

"WAR, HIJACKING & OTHER PERILS EXCLUSION

"(*Hull & liabilities*)

"This Policy does not cover claims directly or indirectly arising from any one or any combination of any of the following or any consequence thereof:

"(a) War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution or insurrection, including malicious acts in furtherance of any of the foregoing — WAR

"(b) Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter — NUCLEAR WEAPONS

"(c) Strikes, riots, civil commotions, or labour disturbances — STRIKES

"(d) Pre-emption — PRE-EMPTION

"(e) Confiscation, seizure, restraint, detention, appropriation or requisition for title or use by any Authority or Government (whether civil, military or *de facto*) for any reason whatsoever — CONFISCATION

"(f) Unlawful seizure or wrongful exercise of control of the Aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the Aircraft acting without the consent of the Insured — HIJACKING

"Furthermore, this Policy does not cover claims arising whilst the Aircraft is outside the control of the Insured by reason of a peril listed in (d) (e) or (f)."

It may be noted that the foregoing clauses included, first substantially all the words urged as sufficient in this case by the all risk defendants, and *then* proceeded to the "HIJACKING" paragraph, which would of course have defeated the present claim against these defendants.

It is perhaps more pointedly noteworthy that this hijacking exclusion clause was included in a BOAC policy effective March 31, 1970; that BOAC purchased dovetailing war risk insurance covering in the same words the perils thus excepted from all risk; and that the BOAC loss at Dawson's Field in September 1970, of which much has been heard in this case, was promptly paid by its war risk insurers.

The record also shows that within short months after the loss in this case, the all risk insurers throughout the world had adopted new exclusion clauses applying in adequate and unambiguous terms to operations like the PFLP hijackings. Such a development adds something to the imposing demonstration that the former clauses lacked the clarity necessary to vindicate the position of the all risk insurers. Hartol Products Corp. v. Prudential Ins. Co., 290 N.Y. 44, 47 N.E.2d 687, rearg. denied, 290 N.Y. 744, 49 N.E.2d 1010 (1943); Orren v. Phoenix Insurance

Company, 288 Minn. 225, 179 N.W.2d 166 (1970).

Plaintiff and the war risk insurers have placed in the record or presented in argument a number of terms, in addition to those already mentioned herein, which would have served with reasonable clarity to exclude the disputed risk. These materials add weight to the case against the all risk defendants. Among the readily available and far clearer terms are, interestingly, some found interspersed, though not helpfully for the all risk insurers, among the all risk exclusions. In the already quoted first paragraph of exclusions, where the all risk coverage was declared inapplicable to governmental "destructions" or "takings," the scope of this exclusion was limited (i. e., coverage was preserved *pro tanto*) by a parenthetical proviso that the exclusion would not apply

"to any such [destruction or taking] by a foreign government or foreign governmental authority following *the forceful diversion to a foreign country by any person not in lawful possession or custody of such insured aircraft and who is not an agent or representative, secret or otherwise, of any foreign government or governmental au-*

thority * * *." (Emphasis added.)

The emphasized words describe exactly the PFLP hijacking. The subject was thus in plain view and plainly dealt with. But it was mentioned only to limit, not to state, an exclusion.

Still other terms familiar to and discussed (or used in policies) by the all risk insurers included "political risks," "hijackings * * * by political activists," any "act of one or more persons * * * for political or terrorist purposes," [26] and additional language offered in the briefs. It is not necessary to labor the subject any more. It is sufficient to say that hijackings for terrorist purposes, by groups like the PFLP, were readily describable in words far closer to the mark than the ancient formulae of marine insurers upon which the all risk insurers variously rest their case.

To avoid the general principle that would lead to resolution of ambiguities against them, the all risk insurers argue, first, that Pan American is a huge company, not entitled to presumptions favoring defenseless insureds against giant insurers. Then, without small-minded consistency, they argue

---

26. The last of these clauses appears in an illuminating setting. In August 1970, before the instant loss, the London all risk underwriters modified the exclusion clauses, which were already clear enough to reach the BOAC hijacking to Dawson's Field and the one in this case. The revised version said (emphasis added):
"WAR, HI-JACKING AND OTHER PERILS EXCLUSIONS CLAUSE (AVIATION)
"This Policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:—
"(a) War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power.
"(b) Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.
"(c) Strikes, riots, civil commotion or labour disturbances.

"(d) *Any act of one or more persons, whether or not agents of a sovereign Power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional.*
"(e) *Any malicious act or act of sabotage.*
"(f) Confiscation, nationalisation, seizure, restraint, detention, appropriation, requisition for the title or use by or under the order of any Government (whether civil [,] military or de facto) or public or local authority.
"(g) *Hi-jacking or any unlawful seizure or wrongful exercise of control of the Aircraft or crew in flight* (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Assured.
"(h) The aircraft being outside the control of the Assured by reason of a peril excluded by paragraphs (f) or (g)."
Note that the italicized words appeared in addition to those on which our all risk defendants rely.

that this is, in practical reality, a "dispute among insurers," not between a carrier and its insured. Neither point has merit.

As to the first, it is clear that we deal with standard—indeed, too standard—insurers' clauses, not terms tailored to the risk in negotiations. Even if this were the latter kind of situation, general rules about claims for exclusions would probably require the usual kind of showing by the all risk defendants. Cf. Bushey & Sons v. American Ins. Co., 237 N.Y. 24, 29, 142 N.E. 340 (1923).

The dispute-among-insurers argument does not adequately embrace the facts and is unsound in law. Pan American's role as plaintiff is no mere formality. It has not been paid for its loss. It faces gaps in coverage that the court may not deem trivial if recovery is awarded against others than the all risk defendants.[27]

Furthermore, the fact that Pan American providently bought other insurance never was and cannot be a source of benefit to the all risk insurers. There was a substantial period in which the all risk exclusions were areas of self insurance for the plaintiff; the private war risk insurance was placed two months after the all risk and the Government coverage considerably later. It is frivolous to suggest (as the argument here in question implicitly does) that the principles of construction were more favorable to plaintiff when the all risk insurers were alone in the picture, or (what is the same thing) that these insurers are to have their exclusions read more spaciously because plaintiff later bought war risk coverage.

The familiar fact is that war risk carriers, for a small fraction of the all risk premiums, take the excluded risks with the benefit of the canons and other considerations by which those risks are fairly to be measured. The law in this respect responds to familiar expectations. As all agree, the all risk defendants have had the burden of showing an exclusion governs while plaintiff has had the corresponding burden of establishing war risk *coverage* against the other defendants.

In further efforts to answer the argument that their exclusion clauses were too vague for the purpose asserted now, the all risk defendants tender a pattern of alleged "business reasons" why more precise words were not used. They stress the distinction between "warlike hijackings" and "non-warlike hijackings."[28] They explain that Pan American would not have wanted *all* hijackings excluded from all risk coverage because this would have made it difficult or impossible to obtain coverage elsewhere for "non-warlike hijackings." This is, however, neither persuasive nor material. The evidence is not convincing that a sophisticated insurance industry would have suffered the unbridgeable gap for which unimpressive evidence was given. What matters is that the exclusions before us, though they are now claimed to accomplish this, nowhere said they reached, even in the dubious phrase here employed, "warlike hijackings."

Elaborating the same thought, but with testimony even less substantial, the all risk insurers have argued a problem of alleged international complications: that American domestic carriers needed

**27.** The all risk defendants comment in an aside upon the fact that the Government's coverage "is $280,000 less than that under the other policies," observing that "Pan American's counsel has stated that it is the matter of prejudgment interest rather than the relatively small difference in coverage amounts which keeps Pan American in the case." The substantial question whether Pan American could have prejudgment interest from the Government may itself entail differences of well over $1,000,000. Without doing the arithmetic, the court recalls that we sit usually to award judgments of less even than $280,000.

**28.** For reasons treated below, it stretches the word unduly to call PFLP's activities "warlike." But this is not important here since the quoted phrase "warlike hijackings" was not used in the disputed policies or any others of which the court has been made aware, although the distinction apparently was the topic of discussion in some circles of the insurance world.

protection only against non-warlike hi-jackings; that there were business pressures from reinsurers which prevented treatment of hijackings as a single unitary peril; and that obstacles like these forced the retention of the old clauses rather than adoption of any of the more suitable alternatives that were in use or readily available. It seems sufficient to say that these contentions are rejected on grounds of both fact and law. Even if the underlying testimony were convincing, it could not avail to dispel the ambiguities in the exclusion clauses or the effects adverse to the all risk insurers.

*The words of exclusion are insufficient to defeat all risk liability*

In a series of ably argued points, ably refuted elsewhere, the all risk insurers present *seriatim* the several terms in the exclusion clauses of which they claim at least some should leave them wholly or partially free of liability. Having concluded that none can avail, the court will deal with these in the order of the all risk presentation.

■ Before doing that it is useful to note the all risk defendants' general approach to this task and to record the court's general disagreement with this approach. In their effort to identify the destruction of plaintiff's airplane as resulting in broad terms from a "war risk," these defendants follow an expansive conception of "proximate cause." They put it this way:

"In a proximate cause sense, the Arab-Israeli Conflict was the efficient cause of the hijacking operation. The seizure and destruction of the aircraft was a political-military act by an organized group which came into existence by reason of the Conflict, which has professed to perform and has performed a violent role in the Conflict, and which has on numerous occasions stated its enmity for the United States as the ally of its enemy Israel. The seizure and destruction of the aircraft were announced by the group as a blow and as retaliation against the United States. We submit that these facts alone would be sufficient to place the loss under the broadly drawn war risk language." [29]

The analysis in the quoted paragraph would apply equally to the bombing of stores in Europe, by children or adults, the killing of Olympic athletes, the killing of an American military attaché in Amman (which occurred in April 1970, leading to recall of our Ambassador), or other individual acts of organization-sponsored violence in the United States or any other place. Without multiplying illustrations. the court finds a basic flaw in the argument. With or without capital letters, the "Arab-Israeli Conflict" may fairly be identified as a "cause" of the terrorist enterprises. But it is difficult to conceive of any context in which the legal concept of "proximate cause" could be held to apply. It would take a most unusual and explicit contract to make the self-determined depredations of a terrorist group, thousands of miles from the area of the "Conflict," acts of "war" for insurance purposes. The court is unpersuaded as a general matter that the traditional words of exclusion should be read with any such sweep.

*The loss was not due to, or the result of, "insurrection, rebellion and civil war in Jordan."*—The quoted words here are from the corresponding point heading in the all risk post-trial memorandum (p. 93). The words "civil war," "rebellion," and "insurrection"—in this order and with "revolution" between the first two —appear as separate, disjunctive exclusions in paragraph 2 of the exclusion clauses. But the changed order and the conjunctive statement appear neither to diminish nor to enhance the argument now considered. As the all risk argument develops, it becomes apparent that reliance here is essentially upon the concept of "insurrection," a somewhat less august (more embryonic, smaller scale)

---

**29.** All Risk Defendants' Post-Trial Memorandum 94.

attack upon a government than "rebellion," and a less momentous and organized conflict than a "civil war."

■ Read in their contract setting, the words "insurrection" and "rebellion" may be defined for present purposes as they were by Chief Judge Magruder in Home Insurance Co. v. Davila, 212 F.2d 731 (1st Cir. 1954). Paraphrasing the pertinent passages of that opinion, and using one policy word as sufficient, we will consider "insurrection" to mean a violent uprising by a group or movement acting for the specific purpose of overthrowing the constituted government and seizing its powers.[30] Proceeding from this definition, the court finds against the claimed exclusion because:

(1) the proof does not establish that there was at material times an insurrection or rebellion in Jordan; and

(2) even if there was, the loss by a hijacking from London to Beirut to Cairo was not one "due to or resulting from" any Jordanian insurrection or rebellion.

(1) In considering whether there was a fedayeen insurrection in Jordan in September 1970 (and, specifically, by September 6, 1970), we start with the unique, and rather uniquely unsettled, state of the Hashemite Kingdom for a considerable period before then. The establishment of Israel in 1948 and the Jordanian acquisition at the same time of land and people formerly Palestinian created conditions of extraordinary tension and conflict. The Palestinians, received as citizens, became a large percentage of Jordan's population, greatly enhanced in 1967. By the period of our concern, 50 to 60% of Jordan's soldiers were Palestinian, though the officer ranks were mainly Jordanians of tribal origin. The Palestinians were strongly represented in the National Council. The fedayeen, a small fraction of the Palestinians, were a diverse group of organizations and individuals, ranging from selfless zealots to armed hoodlums, enjoying, from time to time, varying patterns of esteem or disdain among the Palestinians, the Jordanians, and the other Arab states.

As the masses of Palestinians sought to live and prosper personally, while nursing hopes for revenge or return, their attitudes toward the fedayeen fluctuated. In March of 1968, a substantial battle with Israeli forces at Karama on the East Bank was counted an Arab victory and the fedayeen were regarded as "angels" according to the testimony of a former Jordanian Minister. Beginning later that year and continuing through 1970 their popularity declined steadily among the Palestinians. Many Palestinians by the summer of 1970 hoped for something like peace and welcomed American initiatives toward that goal. The fedayeen were implacably for war. In more homely respects, the fedayeen were often feared and hated. Frequently, less than perfectly disciplined, they used their weapons with abandon, firing at nothing or at targets other than "official" enemies. There was a substantial amount of fedayeen crime—looting,

---

**30.** Judge Magruder wrote that the question whether a group was conducting an insurrection "depended upon what was in their minds as the objective, or objectives, of the uprising." 212 F.2d at 738. It may be questioned whether the great Judge, dealing with concrete circumstances known to him, would have applied so subjective a test as an unlimited abstraction. ("In an earlier case, this court was made aware of the revolutionary objective of the Nationalist Party of Puerto Rico. See Albizu v. United States, 1 Cir., 1937, 88 F.2d 138, certiorari denied, 1937, 301 U.S. 707, 57 S.Ct. 940, 81 L.Ed. 1361, in which we sustained convictions of Pedro Albizu Campos, the leader of the party, and others of his associates, for conspiracy to accomplish the political independence of Puerto Rico by force and violence and by armed revolution against the United States." 212 F.2d at 733–734.) This court would doubt in any case whether destruction wrought by SDS or Weathermen's bombs, however intended subjectively, would be deemed losses from "insurrection" for insurance purposes. In the ultimate view of the facts before us, however, the subject is not of great consequence. The fedayeen (including even the PFLP) did not at pertinent times hope or intend, or mean to attempt, to overthrow Jordan's government.

kidnapping, "rackets." The fedayeen fought among themselves, violently and frighteningly.

As the fedayeen grew more boisterous and troublesome, there were pressures from within King Hussein's government to suppress or destroy them. The officers of his army, and many of his soldiers, were particularly, and increasingly, fierce on this subject. The restiveness of his high military people was a steady source of concern to the King. Among the severe tensions in which he kept a delicate balance was the possibility that the army might take this matter into its own hands.

Meanwhile, through the years into 1970, the various Arab governments pursued their several strategies. All agreed on hostility to Israel, but they were hardly united in other respects. Divergent policies and attitudes were reflected in dealings affecting the fedayeen and Jordanian relationships with the fedayeen. The fedayeen groups had sponsors and enemies in the Arab countries. Habash, for example, the PFLP leader, sojourned in a Syrian prison in 1968, and there was steady enmity between him and Syria. Sa'iqa, on the other hand, was created, supported, and controlled by the ruling party in Syria. Iraq sponsored its own fedayeen organization, the Arab Liberation Front. Other groups had special ties of a similar nature.

General policies toward the fedayeen varied among the Arab states and from time to time. Libya's Chief of State, in the spring of 1970, declared scornfully his unwillingness to give funds to the fedayeen, observing "that 90% of the efforts of the Resistance are devoted to fights and quarrels between their various sections." Egypt's President Nasser treated the fedayeen as a necessary evil —to be used against Israel, of course, but to be held in check, "cut down to size" when necessary, and destroyed when their usefulness ceased. At least some of the fedayeen requited these unloving sentiments. The PFLP newspaper, in August 1970, blamed the Egyptian secret service for bribing "mercenary groups" among the fedayeen to cause violent clashes "daily" between members of the several organizations.

Keeping a semblance of balance within his troubled nation, King Hussein was to earn the admiration of American official observers. The problem was never a simple one of suppressing or "yielding to" the fedayeen. If it had been only that, the army of Jordan was at all times up to the task. The far more complex factors included prominently the community of anti-Israeli interests between the fedayeen and Jordan's government, the pressures from other Arab governments, and the desire to avoid, if possible, the bloodshed and destruction of an all-out test of force.

Through the early months of 1970 and into the summer King Hussein vacillated a good deal and temporized, or at least appeared to, as he picked his way among the domestic and foreign forces testing the fabric of his government. Though it transcends the main boundaries of our subject, it bears recalling, if only by the way, that his maneuverings involved not merely Arab conflicts, but the delicate strategies of a small nation's leader in coping with, or playing off against each other, the pressures and counter-pressures of the U.S.A., the U.S.S.R., and other powers of large size and conflicting ambitions touching the Middle East.

In February 1970, the Jordanian government made a somewhat abortive move to control the fedayeen, a move that was to fail for the moment but to lead eventually to decisive repression in September. Decrees were issued forbidding the carrying of arms and the wearing of military uniforms in the cities, requiring the licensing of automobiles, and ordering other restrictions. Reflecting the complexities, the Minister of Interior resigned in protest. The fedayeen announced they would resist. Armed clashes followed with Jordanian security forces, resulting in casualties of some 50 killed and 100 wounded. The

government retreated. The decrees were modified. The perilous game of challenge and response continued.

In the ensuing months there were repeated flare-ups of violence. On June 8, the PFLP seized an American official and held him for a day or so. He was released after negotiations. A cease-fire of June 11 between Arafat and the government was assailed and violated by the PFLP. Groups of 10 or so from the PFLP occupied two Amman hotels and held the residents, mostly foreign, as hostages to enforce demands for the firing of two army commanders. A new cease-fire between Arafat and the King included accession to this demand.

At a meeting in Tripoli, later in June, Arab leaders of Iraq, Algeria, Sudan, and Syria, with President Nasser of Egypt and King Hussein, worked for a rapprochement between Jordan's government and the fedayeen. A resulting commission went to Jordan, investigated, and agreed on principles to promote better relations. An agreement of July 10 between Arafat and Jordan granted freedom to the fedayeen, subject to Jordanian sovereignty, and provided that fedayeen forces other than the militia would stay out of the cities.

Tensions rose again when, at the end of July, Egypt and Jordan announced acceptance of the cease-fire for which Secretary of State Rogers had been striving. Fedayeen leaders spoke and led demonstrations against this action. There were cries of "Down with Nasser" and similar slogans against Hussein. Resolutions were adopted demanding a share in the government of Jordan. Even Arafat warned in a speech on August 28 that the resistance would "spill a lot of blood." Individual members of the fedayeen were demoralized by long months of impotence against Israel, angered by the specter of peace, and persuaded that the cease-fires presaged attempts by Jordan and Egypt to liquidate their organizations. Never tightly disciplined, these men roamed the streets of Amman and other cities, shooting their rifles exuberantly and starting recurrent waves of alarm. Shops and schools opened and closed without notice. Many residents, especially foreigners, left Amman. Life seemed generally precarious.

To make clear the extent of the challenge to King Hussein, the setting of fedayeen power and assertiveness must be recalled. Beginning as early as February 1970, fedayeen groups had taken charge to a considerable extent of security in refugee camps in Amman and other places. Fedayeen members had set up roadblocks in the cities and elsewhere. They maintained a number of armed "bases" in Amman and other cities. Because fedayeen leadership was often unable to control individual members, petty crime and violence were widespread. In short, conditions in Jordan by late August of 1970 were severely unstable and in an uncomfortable measure anarchic.

Despite all this, other elements in the picture render unconvincing the argument that there was at or around September 6 an "insurrection" or "rebellion." The situation in September was in fact less "rebellious" than it had been in June. There was no repetition of the relatively concerted and aggressive action the fedayeen had taken in the earlier month. Notably missing among them, despite some of the rhetoric, was any intention or purpose, let alone hope, to overthrow the government. Fedayeen leaders recognized fully, at the time and later, that they lacked the power to make any such attempt. Their hope, in demonstrating and speaking out, was once more to bring pressure upon Hussein by enlisting public opinion, by hoped-for defections in the army by threatening violence, and by rallying other Arab governments to their support. But they had no disposition to launch an attack, grimly aware that it would fail. On the contrary, as an important PFLP leader, Ghassan Kannafani, later observed, they "put pressure on the Jordanian government to postpone its attack" on them.

Similarly, early in September 1970, the time when the all risk defendants argue that there was an insurrection, a leader of Al Fatah, the core fedayeen organization, was saying:

"We have said and re-said only today to the Jordanian Government that we have not the intention of overthrowing the Hashemite regime. We have exposed the reasons for which we do not want to seize power, and we think we have furnished the proof of our sincerity. We consider that our role as revolutionaries, as anti-imperialist fighters and liberators of Palestine would be better insured by a movement which would not assume any state responsibilities. We have always tried to create a climate of confidence, at least of mutual tolerance, between the authorities and ourselves. We ask of them nothing else but to allow us to pursue our struggle against Israel and to guarantee to us sanctuary, without which no guerrilla can succeed. We shall never be the first people to shoot, because we want to spare the population unnecessary sufferings, but we have informed the government this morning that from now onwards we will apply the law of eye for eye and tooth for tooth, and we shall reply to every aggression by an act of the same nature and of the same intensity."

On September 9, there was another truce between Arafat and the government, and tensions seemed to be easing further during the next few days. After the hijackings, on September 11, a PLO Central Committee member argued that the time spent debating the hijackings should better be employed relieving the tensions with (not mounting an insurrection against) the Government of Jordan.

While the fedayeen leaders sought to control the situation rather than trigger an insurrection, the pressures on King Hussein to move against them were mounting. As has been mentioned, Palestinians were widely disenchanted with the fedayeen. Outside support was limited, distant, and uncertain. The army, far from defecting, was restively hostile toward the fedayeen. In late August or early September, while the King was reviewing his troops, a tank crew tied a brassiere to an aerial, expressing what might elsewhere seem sexist derision toward his dealings with the fedayeen. In early September, personal intervention by the King was required to halt a tank unit moving against the fedayeen in Amman. At least some observers saw the army's impatience as Hussein's most dangerous concern, raising questions whether he could succeed for long in his policy of restraint.

The supports for this policy crumbled rapidly in the King's judgment. The people and the army reflected wide dissatisfaction with the state of lawlessness and disorder. The two army commanders who had been dismissed as a concession in June were restored to their posts. Hussein's tolerance for the unsettled state of his cities declined. Repeated attempts upon his life served further to test his patience, though not, evidently, his fortitude. On September 16 the time for temporizing ended, but not by an initiative from the fedayeen. They were ordered on that day to turn in their weapons. They refused and called for a general strike. On the following day, the army attacked them in Amman and elsewhere. Within 10 days, despite the special difficulties of fighting in cities, their resistance had been crushed.

 This account must be wound back a little, since the loss in this case began and was completed on September 6. The evidence, however, and the arguments all traced the events through September, and that much at least supplies perspective arguably relevant for the all risk thesis. It shows in the court's view, however, that the developments in Jordan, before and during September 1970, do not add up to an insurrection or a rebellion. The history so briefly sketched here is, to be sure, one of se-

vere unrest in what was probably an unparalleled situation. Jordan's government was in danger throughout 1970. And it may even be said that the offensive taken on September 17, well after September 6, precipitated a brief civil war. But there appears not to have been at any pertinent time the objective of violent overthrow essential to the concept of insurrection or rebellion.[31]

(2) The all risk case fails even if there was an insurrection or rebellion; the loss in suit may not be held to have been one "due to or resulting from" either kind of upheaval. If there was an insurrection and an insured house (or life) was destroyed in the fighting, the loss would presumably be "due to" the insurrection. Cf. Home Insurance Co. v. Davila, 212 F.2d 731 (1st Cir. 1954). Stretching the point a long and probably excessive distance, and only for the sake of illustration, there are some facts for arguing that the aircraft losses at Dawson's Field (*in Jordan*) are similarly classifiable. But there are no such facts here. The hijacking in this case, whatever might have been, had nothing to do with Jordan or with the supposed furtherance of an insurrection there.[32]

The PFLP denounced a large roster of powerful enemies and set for itself a catalogue of large, if long-range, goals to be pursued for the time being by violent means. It proclaimed itself to be fighting—or, as it frequently said, to be "at war" with—Israel, the United States, and other imperialist nations. It fought "reactionary" Arab regimes, notably Jordan's. It could not pursue all of its stated objectives at the same time.

Being a minute organization committed to terrorism as a main weapon, it "made war" upon Israel and Britain by planting bombs in London stores. This was no part of its war [33] against Jordan. It "fought" the United States by hijacking American airplanes. When one such airplane was taken to Jordan there were also suggestions, not very impressive, that this also helped fight Jordan's reactionary regime.

Assuming there was an insurrection in Jordan, it was a *fedayeen* enterprise. In the ranks of the fedayeen, the PFLP was a modest fraction. The hijackings —all of them—far from being in support of overall fedayeen endeavors, were opposed by all the rest. If these enterprises cannot comfortably, even by lawyers, be called frolics, they were certainly the PFLP's separate, independent, determinedly self-serving enterprises. In the total fedayeen picture, they were part of the PFLP's struggle to outshine the other organizations and gain a more prominent place of leadership. They were not in support of any "fedayeen" insurrection. On the contrary, the overwhelming majority regarded them as destructive, likely to alienate humane opinion everywhere, and in no way serving the general cause.

But even such negative and contrary effects applied at most to the hijackings to the wasteland strip in Jordan called Dawson's Field. Far less may be said for the hijacking that ended in Cairo. This was simply and totally irrelevant to events in Jordan.

As clear as any demonstration of this conclusion is PFLP's own statement of

---

31. The court has indicated (note 30 *supra*) its doubt that a subjective intent to overthrow the government, however extravagant in terms of power, could serve in itself to render violent or unlawful conduct an "insurrection," especially where the insurance policy refers separately to "riot" and "civil commotion." It is also held, however, that this kind of intent is a necessary condition though not a sufficient one.

32. The all risk defendants say: "The hijackings *to Jordan* were part of the process of insurrection and rebellion and incipient civil

war then in progress." Post-Trial Memorandum 157 (emphasis added.) Without sticking excessively over phrases, it must be borne in mind throughout that the instant hijacking was not "to Jordan," whether or not it might ever have been planned to be.

33. The court has found that all the talk of "war" was figurative. The terrorist activities served mainly, almost totally, as dramatic and arresting, if also cruel and wanton, forms of propaganda. If they were anything more, they were no part of any insurrection in Jordan.

its purposes. American and other official observers reported frequently tendencies to grandiloquence in PFLP utterances—observations confirmable in the record before this court. But it is enough for present purposes to know that this organization was not more given than other political, especially revolutionary, groups to understatement in its public declarations. It becomes significant in this light that the PFLP made no suggestion of a claim that the taking and destruction of plaintiff's airplane served in any way insurrectionist or other aims hostile to Jordan's government. The explanations, to passengers and others, at the time and later, spoke of attacking the American government for assisting Israel; "warning the people of America;" dramatizing the Palestinian cause; furthering the struggle of black nations against white; and, generally, causing "a sensation throughout the world * * *."

Perhaps also, by landing and destroying the airplane in Cairo, the PFLP's leaders saw themselves forging in the fire "a direct link with the toiling * * * Arab masses," despite the wall the "Nasserite regime" sought to keep between the people and the revolutionary vanguard. The talk, if excessive in some respects, serves to defeat the connection sought by the all risk insurers to a Jordanian insurrection.

The fact that plaintiff's airplane was a second choice—and might, if it could, have been taken to Dawson's Field—does not affect the court's conclusion. In fact, it must be recalled, Diop and Gueye were assigned originally to help with the frustrated El Al hijacking. An El Al success would have been above all a victory in the "war" against Israel. Whether that airplane would have been taken to Dawson's Field and whether such a trophy on the Jordanian desert would have been trumpeted as an insurrectionist weapon against King Hussein are at best highly speculative questions. But the ad hoc violence of flexi-

ble terrorists is not to be rationalized, for insurance or other purposes of our law, by such imaginary reconstructions. It is enough for now that what happened is not shown to have been "due to or resulting from" insurrection, rebellion, or civil war in Jordan.

*The loss was not one "due to or resulting from* * * * *[a] taking* * * * *or destruction* * * * *by any military* * * * *or usurped power* * * * *."* The ancient words considered at this point have led counsel to deal learnedly with legal pronouncements of centuries long gone—about such things as 17th-century mobs storming bawdy houses and the "No Popery" riots of 18th-century London—as well as more recent cases arising from the American Civil War, Dublin's Easter Rebellion of 1916, and the Spanish Civil War even later in the present century. Having reaped the benefits of these explorations, the court will not attempt to review them at length.

In the view of the all risk defendants, "military or usurped power" exists whenever there is "an organized force with authoritative leaders, controlling at least some territory and defying the general enforcement of the laws by force of arms." [34] Resting upon this definition, these defendants say it applies to the PFLP, and more certainly to "the fedayeen."

Plaintiff and the war risk defendants, upon substantial authority, argue that a "military or usurped power," at least in the context of the insurance clauses in issue, must (1) be a *de facto* government, holding adversely and substantially controlling the territory it occupies, or (2) an occupying power in possession by conquest, but not in either event by sufferance of the *de jure* sovereign.

The court finds it unnecessary to explore the subject in detail, except to agree that occupation of ground by sufferance of the *de jure* government is surely insufficient. Going only that far, the facts of record cannot sustain the all

---

34. Post-Trial Memorandum 166.

risk position. First of all, the question must be confined to the PFLP, not extended to the fedayeen generally. As has been noted repeatedly, the taking and destruction were by the PFLP, not allied with, but opposed by, the fedayeen.

■ The record does not sustain on any theory the notion of the PFLP as a "military or usurped power." They had not at any pertinent time seized or controlled any territory over the opposition of the Jordanian government. They "occupied" a training camp at Salt while the fedayeen were being tolerated generally—a barren and exiguous facility containing some caves, tents, and rudimentary structures. Then they "seized" Dawson's Field just before the September 6 hijacking. But that strip was an unoccupied area on a desert plateau. Neither the uncontested occupation of the Salt camp nor the brief episode at Dawson's Field constituted such "control of territory" as the phrase connotes.

Still more decisively, the hijacking far away from Jordan was unrelated to the PFLP's asserted status as a "military or usurped power." If the phrase means anything, it refers to action by a "power" within or near or related to the controlled territory. When the PFLP bombed stores in London or embassies in other countries, it was not functioning as any such "power." In its forays in Europe, even extending back to Cairo, the PFLP was not pursuing its conflict with Jordan and was not remotely describable as a "power," usurped or other. The destruction of the airplane in Cairo was not in the pertinent sense of the insurance term by a "military or usurped power."

*The loss was not one due to or resulting from "war" or "warlike operations."* —Here, as on all points, counsel have compiled a storehouse of elegantly argued learning. Again acknowledging the value of these efforts, the court will attempt to state its conclusions with relative brevity.

As between the two terms "war" and "warlike operations," the parties agree generally that the latter is broader. "War" has been defined almost always as the employment of force between governments or entities essentially like governments, at least *de facto*. See The Brig Amy Warwick (The Prize Cases), 67 U.S. 635, 666–667, 673–674, 2 Black 635, 17 L.Ed. 459 (1862); 2 Lauterpacht, Oppenheim's International Law, 203 (7th ed. 1952). "Warlike operations," as stated by Lord Atkinson in an opinion upon which the all risk defendants rely,

"cover, even where a state of war does not exist, operations of such a general kind or character as belligerents have recourse to in war * * *." Britain Steamship Co., Ltd. v. The King, [1921] 1 A.C. 99, 114.

The cases discussed by the parties range over many violent chapters and incidents in the world's history. The upshot for this case is that there is no warrant in the general understanding of English, in history, or in precedent for reading the phrase "warlike operations" to encompass the infliction of intentional violence by political groups (neither employed by nor representing governments) upon civilian citizens of non-belligerent powers and their property at places far removed from the locale or the subject of any warfare. This conclusion is merely reinforced when the evident and avowed purpose of the destructive action is not coercion or conquest in any sense, but the striking of spectacular blows for propaganda effects.

That the PFLP itself and the fedayeen generally may have engaged elsewhere in "warlike operations" does not affect our result. Battles between fedayeen forces and Israelis, bombings of Israeli territory, and other forms of comparable violence, whether called "guerilla" or "commando" or whatever, were probably "warlike" in a pertinent sense. But that scarcely extends the adjective

to all bombings, killings, and destruction anywhere under PFLP auspices.[35]

The extremes of novel definition to which the all risk insurers are driven were illuminated by expert testimony called in their cause. A political scientist (formerly a State Department official) offered highly literate, colorful, but legally counter-productive views on "guerilla warfare"—a term, it may be noted, not within the exclusion clauses though long known both to the language and to the insurance industry. It developed that his concept of such "warfare" would cover the recent killing in Khartoum of American and Belgian diplomats by an Arab group kin in character and aims to the PFLP; murders on New York City streets in 1917–1918 by members of the Irish Republican Army; or the activities of three or four men in the same city, part of a 30-member group calling itself the Black Liberation Army, shooting from a hiding-place at a police car in furtherance of a proclaimed purpose to establish a black state. These lavish definitions, the expert then explained, were strictly his own, adding: "Political scientists claim they have the right to make words mean what they want them to mean."[36]

It seems safe to conclude that reasonable insurers and insured cannot be deemed to have imagined such things when they used the terms "war" and "warlike operations." This does not mean, we may recall, that they were unaware of terrorist projects like hijackings. What they realized, however, was that such projects were not fairly identified in the standard exclusion clauses —i. e.: "Current war risk exclusions [did] not appear to be effective against intentional damage such as might be caused by hijackings, by bombs placed in aircraft by political activists, by riotous acts, etc."[37]

Far closer to our mark than the all risk expert is a recent expression of our Secretary of State. His views are not controlling in this insurance case. But the distinctions he drew in a United Nations presentation between "war" and such terrorist actions as fedayeen hijackings and killings are found by this court to reflect the kind of boundaries the words should have for insurance policies as well as broader concerns. He said:

"The issue is not war—war between states, civil war, or revolutionary war. The issue is not the strivings of people to achieve self-determination and independence.

"Rather, it is whether millions of air travelers can continue to fly in safety each year. It is whether a person who receives a letter can open it without the fear of being blown up. It is whether diplomats can safely carry out their duties. It is whether international meetings—like the Olympic games, like this Assembly—can proceed without the ever-present threat of violence.

"In short, the issue is whether the vulnerable lines of international communication—the airways and the mails, diplomatic discourse and international meetings—can continue, without disruption, to bring nations and peoples together. All who have a stake in this have a stake in decisive action to suppress these demented acts of terrorism.

"We are all aware that, aside from the psychotic and the purely felonious, many criminal acts of terrorism de-

35. The all risk defendants stress the "warlike" purposes of the PFLP by dwelling upon its military training activities in Jordan, the wearing there of uniforms, and the attempt to inculcate military-type discipline. The hijacking business appears, however, to have been a separate, far smaller department engaging very few members and supporters. Among the total of eight or so hijackings and attempts for which the PFLP claimed credit, one woman participated in at least two.

36. Counsel for plaintiff and war risk counsel assign footnotes in their briefs on this point to echoes from Mr. Carroll's Mr. Dumpty.

37. From the report, quoted more fully above, of the May 1970 meeting of the U.S.A.I.G.

rive from political origins. We all recognize that issues such as self-determination must continue to be addressed seriously by the international community. But political passion, however deeply held, cannot be a justification for criminal violence against innocent persons.

"Certainly the terrorist acts I have cited are totally unacceptable attacks against the very fabric of international order. They must be universally condemned, whether we consider the cause the terrorists invoke noble or ignoble, legitimate or illegitimate.

"We must take effective steps to prevent the hijacking of international civil aircraft.

"We must take effective steps to prevent murderous attacks and kidnaping of diplomats.

"We must take effective steps to prevent terrorists from sending bombs through the mails or murdering innocent civilians.[38]

■ Whether or not such actions are effectively stopped—and whether or not our national policy approves or condemns them—they are not "warlike operations" within the meaning of the exclusion clauses here in issue.

*The loss was not the result of "riot" or "civil commotion."*—The battle lines shift at this point, reflecting, among other things, a change in the outlook of the all risk insurers. In answers to interrogatories these defendants disclaimed reliance upon the exclusions for either riot or civil commotion. Similarly, in opposing a motion for partial summary judgment all risk counsel said:

"Again, with the greatest respect, we think that this riot, civil commotion issue is a false issue.

\* \* \* \* \* \*

"The real controversy is among the three insurers. None of us claim that this was a riot or civil commotion, as I understand it.

\* \* \* \* \* \*

"To talk of what the PFLP were doing here in terms of a spontaneous riot or a mere civil commotion, somebody who wants bread, or cheaper corn, or something like that, would be a complete misconception of it \* \* \*."

In the trial, however, and now, the all risk defendants argue as a fall back position that the loss was "caused by riot and civil commotion."[39] The plaintiff joins the all risk insurers in this contention, siding with the war risk defendants as respects all the other exclusions.

To begin with the English words and the sense they immediately convey, both "riot" and "civil commotion" seem farfetched to denote the hijacking over London and thence to Beirut and Cairo. "Riots," as reflected in the above-quoted argument of counsel and the briefs before us, evoke images of such wild disorders as "draft riots," "prison riots," "bread riots," "student riots," etc. We think in this nontechnical sense of uproar, tumult, and violent mobs. We think of numbers of participants surely greater than the two disciplined and comparatively businesslike hijackers over London, even with the six to nine who joined them temporarily during the unscheduled stop at Beirut, or with the third who stayed aboard for the flight to Cairo and the demolition work. The phrase "civil commotion" is less of an everyday thing, but it too suggests non-technical meanings scarcely descriptive of the hijacking: it denotes, as shown by the war risk defendants' dictionary references, encounters "such as occur among fellow-citizens or within the limits of one community,"[40] disturbance,

---

38. Statement of Secretary Rogers to the U.N. General Assembly, September 25, 1972, in 67 Dep't State Bull. 425, 429 (1972).

39. Post-Trial Memorandum 233. As has been noted, a decision sustaining this view would result in liability of approximately $10,000,-

000 for the defendants named in the first and third claims, with the balance falling upon the war risk insurers.

40. See "civil" in the Oxford English Dictionary.

disorder, turbulent crowds, and tumult having some extension in time or space.[41]

If these ordinary meanings of the words are not the end of the subject, they are at least large beginnings. See Republic of China v. National Union Fire Ins. Co., *supra*, 151 F.Supp. 211 at 231–232. "A common-sense appraisement of everyday forms of speech and modes of thought" may in this case help us if they do not ineluctably "tell us when to stop." Cardozo, J., in Bird v. St. Paul F. & M. Ins. Co., 224 N.Y. 47, 51, 120 N.E. 86, 87 (1918). After following the diverse and multi-directional tracks of counsel's legal learning, the court concludes it would strain the words unwarrantedly to find that either a "riot" or "civil commotion" caused the loss in suit.

■ Recognizing that "riot" would not fit as a matter of ordinary usage, plaintiff and the all risk insurers invoke a handful of cases, none more recent than 1928, from which they extract these definitions of "riot" "for insurance purposes."

"A 'riot' for insurance purposes, is a gathering of three or more persons with a common purpose to do an unlawful act, with overt acts to accomplish that purpose, with an apparent intention and ability to use force if necessary against any person who may oppose them in the execution of their common purpose, and with force or violence displayed in such manner as to deter from opposing them at least one person of reasonable firmness or courage who might otherwise oppose them."[42]

"A riot exists if three or more persons, with a common object and intent to help one another, use force or violence or threaten force or violence in such a manner as to cause alarm."[43]

The definitions give serious trouble at the outset, and probably would not serve even if there were sound reason to use them. Plaintiff's airplane was hijacked by two people, not three. There was, to be sure, a stop at Beirut as the improvised operation unfolded, and as many as nine others came aboard temporarily. Then, still meeting the minimum, a third man stayed aboard to Cairo. But the notion of a flying riot in geographic installments cannot be squeezed into the ancient formula. Among its other attributes, as the cases reflect, a riot is a local disturbance, normally by a mob, not a complex, traveling conspiracy of the kind in this case.

There are, however, serious questions within the old legal materials themselves that leave the proposed definitions at least dubious, and, in the final analysis, unacceptable. Both parties contending for three-member riots present as their first, and most recent, authority the decision in Insurance Co. of N. America v. Rosenberg, 25 F.2d 635 (2d Cir. 1928). That case, apart from the fact that it involved seven armed men causing terror and destruction, dealt not with an exclusion, but with coverage. The coverage was for losses from a number of causes including "(1) Riot [and] (2) riot attending a strike * * *." *Id.* at 635. As Judge Manton wrote, the question for decision was whether the "occurrence constituted a riot or a riot attending a strike." *Id.* at 636. And the approach to this question included the premise that the disputed words "should be liberally construed so that the insured [would] be indemnified against loss, which the parties intended * * * to insure against." *Id.* at 637. The facts tying the depredation to a strike were undisputed. It was sufficient to hold, as the Court did (*id.* at 637): "It was a riot attending a strike." The dicta in that case, where the argument for cover-

---

41. See *id.*, "commotion," and the same word in Webster's Third International Edition.

42. Appendices to Post-Trial Brief of Plaintiff A4–A5.

43. All Risk Defendants' Post-Trial Memorandum 234.

age under a totally different kind of insurance was so compelling, offer scant guidance for the present case.[44]

Returning to the fountainhead of the ancient concepts and ancient language of marine insurers, plaintiff next cites London and Lancashire Fire Insurance Company, Ltd., v. Rolands, Ltd., [1924] A.C. 836. That case concerned a policy of insurance against losses from burglary, housebreaking, and theft, containing exclusions in familiar language from losses "happening through or in consequence of * * * invasions, hostilities * * * riots, strikes, civil commotions," etc. [1924] A.C. at 837. In an arbitration proceeding it was found that the insured's Dublin bakery was invaded on June 25, 1921, by four armed men, who proceeded to cow the occupants and take cash from the cashier's office. In the report of the arbitrators' findings, it was stated: "There was no riot or disturbance about the place." P. 839. Nevertheless, the arbitrators went on to hold that the facts "constituted a riot within the legal definition of the word," id., and ruled against the insured. The claimant sought judicial review and prevailed through the three levels of courts in Ireland. Reversing all those courts, the House of Lords agreed with the arbitrators.

With all the deference we accord the ancestral authorities on the old mysteries, the opinions in the House of Lords are not impressive. Apart from that, there are aspects of the opinions that diminish their force as persuasive authority. There are intimations, though they are not more clear than other things in the opinions, that the Lords may have perceived limits on the scope of review of arbitrators.[45] Still more importantly, though the case superficially concerned theft by four men (and a marvelous holding that this was not a covered "theft" but a "riot"), it is quite evident that the court was affected by its awareness of the disturbances in Dublin and elsewhere in Ireland at the time. Thus, Viscount Finlay observed, "it is clear that those who were conducting the operation felt that they had force behind them" (p. 844). Similarly, Lord Sumner said "there was evidence to go to a jury upon the application of the policy even in the sense of the word 'riot' contended for by the appellants" (p. 848)—i. e., the "ordinary and popular sense" in which the word "means a tumultuous disturbance of the peace" (p. 840). In short, on its special facts and its particular opinions, the flat rejection in the foregoing case of the understanding of an "uninstruced layman" (p. 847—Lord Sumner) is not weighty authority here.[46]

The few decisions just discussed exhaust the case law from which plaintiff and the all risk insurers would fashion their definition "for insurance purposes" of the term "riot." In addition, they quote from Blackstone and refer to one or two other texts. Taken all together, and before turning to the authorities that work further impairments, this is not an imposing foundation to sustain a definition which is at least surprising in terms of ordinary English usage.

There are other difficulties, however. There is substantial basis for the view that (1) the strained definition urged for the exclusion is not "the" common

---

44. Cited next by both proponents of the exclusion is Brous v. Imperial Assur. Co., 130 Misc. 450, 224 N.Y.S. 136 (N.Y.Co.1927), aff'd, 223 A.D. 713, 227 N.Y.S. 777 (1st Dep't 1928). As stated by them, it is substantially identical. It is, therefore, identically distinguishable.

45. "The question for the Court is whether in point of law the arbitrators could come to the conclusion at which they arrived as to the effect of the clause so far as 'riot' is concerned." P. 842 (Viscount Finlay).

46. We are also referred on the subject of "riot" to the case of Motor Insurance Company v. Boggan, [1923] 2 Ir.R. 136, another reversal of three Irish courts, this time finding both "riot" and "civil commotion." In this case, however, it is far more evident that the swirling events of Irish troubles surrounding the particular crime in question played a decisive role and supplied considerations clearly distinguishing the case from ours.

law definition of "riot," for insurance or other purposes; (2) the historic definition, if it were really the proper one to use, would not apply anyhow to the facts; and (3) the guides of ordinary English usage should be followed in any event.

As a standard text repeats, the traditional common law definition of "riot" has almost invariably included as an essential element that the force, tumult, and turbulence should be directed to "the execution of some enterprise of a private nature * * *."[47] That reference to a "private enterprise" would exclude, of course, most of the upheavals we commonly think of today as riots, just as it would exclude the events before us. But if we were driven to the primeval recitals of the common law, however seldom they were actually applied, the insurers seeking absolution might fairly be called upon to accept the oddities that hurt not less than those that help. And it is inescapable that the common law authorities repeat, scarcely less frequently than the improbable reference to "three persons or more," the element of private objectives. E. g., Spring Garden Ins. Co. v. Imperial Tobacco Co., 132 Ky. 7, 116 S.W. 234, 236 (1909); Salem Mfg. Co. v. First American Fire Ins. Co., 111 F.2d 797, 802–803 (9th Cir. 1940), quoting 1 Russell on Crimes 265, 1 Hawkins, Pleas of the Crown 513, 2 Wharton §§ 1537, and 1544, and citing cases; Adamson v. City of New York, 188 N.Y. 255, 258, 80 N.E. 937 (1907), adding a reference to Greenleaf; Walter v. Northern Ins. Co. of New York, 370 Ill. 283, 18 N.E.2d 906, 908 (1938).

On a somewhat more compelling note, it was in fact exceedingly rare, even in olden times, for insurance or any other purposes, that numbers of actors as small as we have in this case were deemed capable of mounting a riot. In distinguishing riots from other kinds of violent crimes by groups of people, the courts tended regularly, as everyone does, to speak of "the disorder" and "the tumult," along with "the terrorizing, the putting in fear, the violence, [and] the unlawful acts [as] * * * the essential things." Spring Garden, *supra*, 116 S.W. at 237. See also Hartford Fire Ins. Co. v. War Eagle Coal Co., 295 F. 663, 665 (4th Cir. 1924) ("the fire was not caused by riot, for there was no tumult nor disturbances * * *"). A riot meant, as it surely does now, "wild or irregular action or tumultuous conduct * * *." Kirshenbaum v. Massachusetts Bonding & Ins. Co., 107 Neb. 368, 186 N.W. 325, 326 (1922). It connoted "violent and noisy" action, 5 Appleman, Insurance Law and Practice § 3111 (1970), "in a violent or tumultuous manner," 11 Couch on Insurance 2d § 42:485 (2d ed., Anderson, 1963). Although most of the passages thus cited referred to numbers of persons as low as three, the context revealed this as a self-contradictory improbability, almost never exposed to reflective inspection. In the often cited case of Spring Garden Ins. Co. v. Imperial Tobacco Co., *supra*, the court expressed skepticism about sparsely populated riots, observing that on the particular facts presented it was not

> "called upon * * * to make any nice or refined distinctions as to what number of persons, or what character of conduct, would constitute a riot if only a few were engaged in it and their actions might leave room for doubt as to whether or not what they did amounted to a riot. We can easily understand that there might be serious doubt as to whether the acts of three, or a small number of persons, or, indeed, any number, acting in concert for an unlawful purpose, would amount to a riot. Whether what they did would or not be a riot within the meaning of the definitions given would depend upon the facts and circumstances presented in the particular case." 116 S.W. at 237.

If the point was open to "doubt" in 1907—which would not aid the claim for exclusion—it seems clearer today that

47. 11 Couch on Insurance 2d § 42:185 (2d ed., Anderson, 1963).

what happened in this case is not fairly or aptly described as a riot. The cases and texts, apart from unpersuasive expressions from the House of Lords, have defined the word for insurance purposes in accordance with "its popular and usual meaning," *Spring Garden, supra,* 116 S.W. 234 at 236, as "used in the everyday affairs of life." Salem Mfg. Co. v. First American Fire Ins. Co., *supra,* 111 F.2d 797 at 803. See 5 Appleman, *loc. cit. supra;* 11 Couch, *loc. cit. supra.* Popular usage is a changing thing. It is of some pertinence, then, if by no means decisive, to consider recent changes in statute law and their explanation. Cf. Insurance Co. of North America v. Rosenberg, *supra,* 25 F.2d at 636. New York's Penal Law since 1965 defines two degrees of "riot;" the first degree requires at least 11 participants, § 240.06, the second degree at least five, § 240.05. The Practice Commentary, explaining the increase from the common law requirement of three, says:

"The revised Article, presenting the crime in two degrees, seeks to conform it more to the popular conception of a 'riot' by requiring a greater number of 'rioters' and by shifting the emphasis from commission of some other crime to 'tumultuous and violent conduct' causing, or intended or calculated to cause, 'public alarm.' "[48]

■■■ Other illustrations of current usage have been called to the court's attention,[49] but it seems unnecessary to lengthen this discussion. The court concludes that if assemblages numbering as few as three could ever make "riots," for insurance purposes, they do not today.

Moreover, even by the old test of three, there was never a riot here. The initial taking of the airplane was by two. There was no such turbulence, no such "wild or irregular action or tumultuous conduct," Kirshenbaum v. Massachusetts Bonding & Ins. Co., *supra,* 186 N.W. at 326, no such "boisterous and disorderly" conduct, Salem Mfg. Co., *supra,* 111 F.2d at 803, as "riot" connotes. It is strained and artificial to find, and the court cannot find, that the hijacking "became" a riot when Lebanese authorities allowed the airplane to land at Beirut for humanitarian concerns and permitted other PFLP people to join Gueye and Diop. It makes neither factual sense nor sound law to say the Beirut authorities invited or allowed the organization of a "riot." It is similarly unacceptable to say the project became a riot when the third man stayed aboard to help with the demolition.

If all this were less clear than the court perceives it to be, there is surely enough doubt, apart from the doubts the insurers themselves expressed at various times, to hold the riot exclusion inapplicable.

The argument for exclusion under the head of "civil commotion" must also fail. This subject is ruled to a large degree by the court's finding, already elaborated, that the hijacking from London to Beirut to Cairo was not in fact "caused" by—and was not proximately related to—the conflicts between the fedayeen and the government in Jordan.

Both plaintiff and the all risk insurers join in supporting the following definition:

"A 'civil commotion,' for insurance purposes, describes a situation similar to a riot but involving either a more serious disturbance or one that is a part of a broader series of disturbances."

48. Nobody argues, and the court does not suggest, that the New York statute is in any sense "controlling" despite the agreed applicability of New York law. It is merely an item among many to be considered in determining the meaning properly assignable to a word in a legal dispute.

49. The Second Circuit, in the coverage case upon which primary reliance is placed for the riot exclusion, relied *inter alia* upon the New York Penal Law as it then read, with the definition of riot in terms of actions by "three or more persons * * *." Insurance Co. of North America v. Rosenberg, *supra,* 25 F.2d at 636.

The all risk insurers argue that this is too sedate a description of what must, under authorities they cite, be a far more turbulent, probably insurrectionary disturbance, involving numbers of people and an extent far larger than a "riot." There is substance in the argument, but the issue may be passed. It should be clear from the court's findings that the Pan American hijacking, viewed without reference to the hijackings to Dawson's Field or without reference to Jordan, could not be deemed anything in the nature of "civil commotion" on any arguable definition of the phrase.

The relatively substantial argument is that the hijacking of the 747 must be viewed as "due to or resulting from"— or part of—either (1) the same disturbances as those leading to the three other hijackings to Dawson's Field on September 6 (plus, possibly, the BOAC hijacking on September 9, three days after plaintiff's craft had been destroyed), or (2) the broader sweep of turbulent events of fedayeen-government conflict in Jordan, or both of these, and that this view leads properly to application of the "civil commotion" exclusion. The proposed analysis is neither factually nor legally sustained.

Civil commotion occurs in a locale—a city, a county, perhaps a country, or an area. It is essentially a kind of domestic disturbance notwithstanding the misconceived arguments of counsel here from one exotic case enormous researchers have yielded involving a disturbance at the ill-defined border of Brazil and Bolivia. Republic of Bolivia v. Indemnity Mutual Marine Assurance Company, Ltd., [1909] 1 K.B. 785 (1908), aff'd, [1909] 1 K.B. 792 (C.A.)[50] The authorities speak consistently of (and the cases all concern) "local * * .* outbreaks," e. g., Kirshenbaum v. Massachusetts Bonding & Ins. Co., *supra*, 186 N.W. at 326, and "domestic disturbances," e. g., Rogers v. Whittaker [1917] 1 K.B. 942, 944; 11 Couch, op. cit. *supra*, § 42:487. If, as plaintiff says, "efforts to define [civil commotion] have been unsatisfactory,"[51] there has been no uncertainty on this score.

Standard insurance language points to the same conclusion. To go no farther than this case, the separate paragraph of "war risk" exclusions is

"3. strikes, riots, civil commotion." The seeming reference, contrasting with the preceding clauses, appears to identify a category fairly characterized as "domestic disturbances." See Rogers v. Whittaker, *supra*, 1 K.B. at 944.[52]

A threshold difficulty, then, for the "civil commotion" claim is sheer geography. It stretches the concept beyond breaking to reach for our hijacking

---

50. The parties have devoted some argumentation to whether the cited case involved events wholly within Brazil or extending across the border into Bolivia. The court reads the report as showing (as plaintiff and all risk contend) the border was crossed, but the detail is of no moment. "The word upon which this case turns is 'piracy.'" 1 K.B. at 802. The talk by the English Judges of "riot" and "civil commotion" is primarily to show why the events on the Amazon did not add up to "piracy." Of still greater interest for us, however, is that the events occurred in a compact "piece of territory" where the very question (on which the governments of Bolivia and Brazil were agreed) was as to Bolivian assumption of control, and where, in net effect, Brazilians were resisting the authority of their own government. It was in truth a case of "intestine troubles" (p. 801), perhaps in the nature of an incipient "civil war" (*id.*), and thus might "properly be described as a 'civil commotion'" better than "piracy" (*id.*). It is as remote from our case in law as it is in geography. If anything, its territorial aspects could only (if slightly) reinforce the grounds against exclusion.

51. Appendices to Post-Trial Brief A17.

52. Unlike the clause involved here and in Rogers v. Whittaker, *supra*, the provisions of some other policies associate the exclusions for "strikes, riots, [and] civil commotion" with the additional exclusions of "malicious mischief" and "intentional damage." The latter terms are, of course, far more general; their presence would weaken the point that the third paragraph as a whole seems to contemplate only "domestic disturbances." The war risk insurers argue for potent inferences adverse to the all risk defendants because of the omissions. It is sufficient to say here that the all risk position is certainly not enhanced by this factor.

from Dawson's Field or the rest of Jordan, or to sweep the Pan American airplane into a kind of globally scattered "commotion" based upon a supposed identity of causes, motives, or purposes. Efforts to do this by case law analogies are illuminating failures. The all risk insurers say:

"The cases recognize that actions in one area which result from riot or civil commotion elsewhere are nevertheless excluded under policy language such as that at issue." [53]

"The cases" asserted to say this start with Cooper v. General Accident, Fire & Life Assur. Corp. [1922] 2 Ir.R. 214. That was a case of taking of a motor vehicle in the County of Cork by Irish revolutionists where the only record evidence of general civil commotion was indeed "elsewhere"—some five or six miles away in the same County—and where the whole nation was in a state of seething unrest. Next, we are referred to Hartford Fire Ins. Co. v. War Eagle Coal Co., 295 F. 663 (4th Cir. 1924), where labor violence in Mingo County, West Virginia, was found as a fact to have been civil commotion leading to a coal mine fire. The opinion affirming that determination observed there had been "a serious question whether the conspiracy and destruction of the War Eagle mine property was a consequence of lawlessness in sections of the county where there had been civil commotion, or was due to the independent initiative of the five conspirators acting secretly and quietly in furtherance of the effort to unionize the mines." Id. at 665.

That is a valiant use of precedent, but it is not persuasive that there was an effective "export" (in war risk counsel's apt term) of civil commotion from Jordan to the skies over Europe and into Beirut and Cairo.

Focusing still on geography for the moment, and postponing more central objections, the notion of "civil commotion" at Dawson's Field rings false as a matter of physical and social fact. The strip was on a forsaken desert plateau. There was nothing and nobody there to disturb, unsettle, or upset. The turbulence and the "community" arrived together, were basically identical, and soon departed. There was no tumult of a relevant kind because there was no peace to violate, no pattern of law-abidingness to disrupt, no interruption of a course of law and order. As has been stated earlier, what went on there was not a part of general fedayeen "commotion" in Jordan; it was a PFLP enterprise, for PFLP objectives, separate from and opposed by the others.

Of more basic and independently significant importance for our problem is that the Pan American hijacking was physically distinct, and, as it developed, distinct in purposes and intended consequences, from the others. This has been covered already, but it is worth reiterating. If Diop and Gueye had boarded the El Al flight, and if the hijacking had succeeded, they *might* have wound up in Dawson's Field and an El Al airplane might have been destroyed six days later. It is impossible to know that, but it is plausible speculation. It is also likely from the evidence that if the 747 could have landed there, it would have gone to Dawson's Field. That, skipping other difficulties, would make the argument now under inspection more tenable. But it was still early on September 6 when the impossibility of Dawson's Field as a destination for the Pan American jet became known to the PFLP. The hijackers continued to improvise, continued to reshape hastily the character of the events and the resulting problems of our lawsuit. If Jordan and, for the sake of argument, the "civil commotion" there had been the PFLP's only enterprise, they knew the 747 was not an eligible component. They did not have to destroy it. If they had lacked other enemies and other projects, they could have contrived readily to spare it. But it served in their change of front for their "war" against the United States and,

---

53. Post-Trial Memorandum 242.

possibly, against President Nasser. As the disaster unfolded, and as the PFLP touted it, there was no connection with Jordan or with any civil commotion there.

Thus, before the Dawson's Field commotion had really gotten under way, the separate horror of the 747 had ended in Cairo. Indeed, when this airplane was destroyed, it was not at all clear that any of the others would be. The latter were held for ransom until negotiations failed. But all that is incidental at most for us. The key point here remains that the two widely separated affairs cannot be combined as the exclusion theory would have them. This is a case where the facts remind us "how impossible it is to set aside as immaterial the element of proximity in space." Bird v. St. Paul F. & M. Ins. Co., 224 N.Y. 47, 52, 120 N.E. 86, 87 (1918). If what the PFLP wrought at Dawson's Field was "civil commotion," the tragedy of plaintiff's airplane was not part of it.

Less needs to be added concerning the contention that the loss "resulted" more generally from "civil commotion in Jordan." [54] However wide the "net" of causation may be, Bird, supra, at 51, 120 N.E. 86, it cannot in fact span this much on any sensible reading of our record, including especially the PFLP's go-it-alone program of terrorist "external operations." The disturbances within Jordan in September 1970 may have amounted to "civil commotion," and the PFLP made its contribution to that. Had the 747 airplane been smaller, it might have been impressed into that service. But it was not.

 Concluding this portion of our account, it is well to remember that we are dealing with an insurance policy, and to recall the basic assumptions and expectations attending such a transaction. However far we have traveled in this inquiry, we come back to the obliga-

tion to read the words as we infer they should have been read by those who used them. "Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract." Bird, supra at 51, 120 N.E. at 87. See also Harris v. Allstate Ins. Co., 309 N.Y. 72, 75, 127 N.E. 2d 816 (1955) (Fuld, J.); Mansbacher v. Prudential Ins. Co., 273 N.Y. 140, 144, 7 N.E.2d 18 (1973); Republic of Bolivia v. Indemnity Mutual Marine Assurance Co., Ltd., [1909] 1 K.B. 785, 790, 791, 792, 804. It is not easily imaginable that any ordinary man, business or other, would have supposed a hijacking over London of an airplane that never went or was intended to go to Jordan would be deemed the result of "civil commotion in Jordan."

*The all risk claims for judgment because CIA documents were withheld lacks substance*

The all risk defendants have unleashed manpower, suited to the sums at stake, in massive works of factual and legal research. Lavish discovery has been had of State Department, FAA, and FBI documents to learn about the PFLP, the Middle East struggles generally, and the disputed hijacking. Several inches of secret and otherwise classified State Department papers have been made a peculiar sort of secret annex to the record, with counsel and the court (*dubitante*) submitting to "clearance" procedures for access. All risk counsel also demanded, however, secret Central Intelligence Agency (CIA) documents, and this agency, after some procedural rituals, interposed the "secrets of state" privilege. Ultimate determination of the issue thus posed was postponed until after trial. The all risk defendants at this point make the heady claim that if all else fails, they should have judgment for this reason against the "United States." [55]

---

54. All Risk Defendants' Post-Trial Memorandum 236.

55. We deal in this aspect with "a privilege * * * well established in the law of evi-

dence", the existence of which "is conceded * * * by the most outspoken critics of governmental claims to privilege." United States v. Reynolds, 345 U.S. 1, 6–7, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953) (footnotes

There is a threshold question of some magnitude whether the problem should be considered as one of discovery against the Government as a party. The all risk defendants have, strictly speaking, no claim against the United States, which has sold insurance to the plaintiff. The Government's "proprietary" role as insurer does not comfortably or conveniently lead to the conclusion that all its agencies, however separate, must be treated as fractions of this single "party" for discovery purposes. It might well be held that the applicable standards for disclosure are those of the Freedom of Information Act and that the all risk argument is ended by the duly imposed "secret" classification under the ruling in Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S. Ct. 827, 35 L.Ed.2d 119 (1973).

But even viewing The Government as a monolith, and applying *inter partes* rules of discovery, the all risk argument fails because:

(1) the claim of privilege appears to have been justified in the circumstances, at least when measured against

(2) the trivial showing of alleged need for disclosure.

The CIA Director explained the refusal to disclose, even for *in camera* inspection, on the ground that:

"The revelation of the identity of these sources to the Court or to the parties to this litigation could result not only in their loss to the Central Intelligence Agency for the future but also in serious physical danger to a number of them who are risking their lives and careers to assist us."

The circumstances apparent to the court from the entirety of this case render this a realistic and convincing concern. The setting reeks of violence and danger. The loss of American and other lives through terror is a vivid part of our evidence. But there should be no need to linger over this. With characteristic responsibility, all risk counsel reported during the trial that one of their witnesses had probably lied in cross-examination, and that the explanation appeared to be potential physical dangers to him had he done otherwise. The matter was left at that. It seems appropriate to pay similar heed to the representation of the CIA without yielding an iota of the court's responsibility and power to judge for itself the grounds of a claim of privilege.

This conclusion is reached easily in this case because the asserted needs for disclosure are shadowy and speculative at best. It is said that CIA documents might indicate (by hearsay, of course) payments by Arab governments to the PFLP. But the all risk defendants had the PLA Commanding General on the stand for days and did not even ask about this. Moreover, other evidence adduced by the all risk defendants showed there were no such payments, or none of consequence. It is argued that CIA hearsay might disclose PFLP intent and "aims and operations during 1970." But surely our record, including reams of State Department hearsay, to say nothing of PFLP's non-reticent functioning, is ample on that. It is argued that the all risk defendants tried unsuccessfully to procure a witness from the PFLP, and that the CIA files would be or show "other sources of alternative evidence." But this persists in overlooking the hearsay rule and is otherwise a matter of unlikely conjecture.

▇▇ In short, we have here, with the perspective of a huge record, a "formal claim of privilege set against a dubious showing of necessity." United States v. Reynolds, 345 U.S. 1, 11, 73 S. Ct. 528, 534, 97 L.Ed. 727 (1953). The

omitted). The problem is largely different from those, publicly and judicially debated as this is written, of "executive privilege" assert-

ed for Presidential papers because of confidential relations between the Chief Executive and his staff.

"formal claim" was made in a setting of substantial assurance that legitimate concerns for security and human life were at stake. Against that were extensive alternative sources, including broad disclosures by government agencies. The court is led upon the record as a whole to the firm judgment that the "intelligence" sought would not have enhanced significantly the factual knowledge needed for this lawsuit.

It is concluded, under the principles of United States v. Reynolds, that there was no occasion for insisting upon *in camera* inspection of the documents and that there is no basis either for the extraordinary judgment the all risk insurers seek or for any other "sanctions." [56]

*Fraud, wilful misconduct, negligence*

If the preceding conclusions are correct, the questions under this heading are not reached. But the case is one in which there might be an appeal, and *nisi prius* judges are commissioned to be fallible. Cf. Brown v. Allen, 344 U.S. 443, 540, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring). In the interest of possibly avoiding undue prolongation of this case, but wishing to limit further prolongation of this opinion, the court records in summary fashion some other findings and conclusions.

■ The Government has presented, has altered sharply from time to time, has almost abandoned at least once, but has finally persisted in, a defense of fraud allegedly underlying the insurance it sold to plaintiff. The presentation on this score is the least impressive aspect of the Government's able submissions.

Having worked through the winding course of this subject, the court finds it sufficient now to say that, if it mattered, the Government's views would be utterly rejected and plaintiff's views (as amply briefed) accepted on both the facts and the law.

■ Charges of negligence and wilful misconduct against the plaintiff are defeated by the findings of fact reported in the first part of this opinion. Moreover, even if plaintiff's people were held to have been negligent, this court would also hold that the negligence, in the circumstances of this case, was not the proximate cause, not "the dominant and effective cause producing the loss," United States v. Standard Oil Co. of New Jersey, 178 F.2d 488, 494 (2d Cir. 1949), aff'd, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68 (1950), not, in other words from the higher stage of the same case, " 'that cause which [was] most nearly and essentially connected with the loss as its efficient cause.' " 340 U.S. at 58, 71 S.Ct. at 137, quoting Dole v. New England Mut. Ins. Co., 7 Fed.Cas. 837, 853 (C.C.Mass.1864).

*Prejudgment interest*

It is agreed that plaintiff is entitled to prejudgment interest from the date of demand upon any recovery from the all risk insurers; that the rate is a matter of New York law; and that this rate has been 6% under CPLR § 5004 as effective since September 1, 1972. Prior to that date the rate was 7½% on unquestioned grounds we need not review. There is disagreement whether the provision for 6% in § 5004 is retro-

---

56. The all risk defendants suggest that even if the claim of privilege is upheld sanctions should be ordered against the Government. They rely for this view upon Proposed Federal Rule of Evidence 509(e). But that proposed provision suggests only the possible remedies a court might fashion for a party deprived of "material evidence." The all risk defendants have failed to demonstrate such a deprivation. Furthermore, the notes of the Advisory Committee suggest a narrow construction of Rule 509(e) as it relates to the privilege here in question in view of the decisions reflecting an "unwillingness to allow the government's claim of privilege for secrets of state to be used as an offensive weapon against it. United States v. Reynolds, *supra*; Republic of China v. National Union Fire Ins. Co., 142 F.Supp. 551 (D.Md.1956)."

active to the time before September 1, 1972.

The only New York decision the court knows quite directly in point is Yamamoto v. Costello, 73 Misc.2d 592, 342 N.Y.S.2d 33 (Sup.Ct.Nassau Co.1973). In that opinion Mr. Justice Harnett reviews the legislative history of amended § 5004 and the relevant New York authorities. His thoroughly persuasive analysis leads to the conclusion that the amendment applies prospectively only. If it were a matter for independent judgment, this court would reach the same result following its own study. It is thus entirely agreeable, and probably compulsory, to follow the cited decision. See Caldecott v. Long Island Lighting Co., 417 F.2d 994, 997 (2d Cir. 1969).

Accordingly, plaintiff will have interest at the rate of 7½% from September 15, 1970, when liability was denied, to September 1, 1972, and at the rate of 6% thereafter.

### CONCLUSION

Plaintiff is entitled to recover, as claimed, a total of $24,288,759 from the defendants named in the first, second, and third claims, with interest as indicated immediately above. The complaint will be dismissed as against the war risk defendants and the United States. The all risk cross-claim is also dismissed, as it probably should have been long ago.

Plaintiff will submit a form of judgment, preferably after consultation with the other parties and upon their consent, if possible, as to form. If there is not agreement, the judgment will be submitted on at least three days' notice, and the other parties will submit specific objections and counter-proposals as to the disputed portions rather than separate proposed judgments of their own.

Again, recognizing that not all will find just compensation in this, the court commends and thanks counsel for their splendid efforts.